778 So.2d 1 (2000)
Henry Cornelius GRAYSON, Jr.
v.
R. B. AMMON AND ASSOCIATES, INC., et al.
No. 99 CA 2597.
Court of Appeal of Louisiana, First Circuit.
November 3, 2000.
Writ Denied January 26, 2001.
*6 David L. Bateman, Baton Rouge, LA, Attorney for Plaintiffs/3rd Appellants, Henry Cornelius Grayson, Jr., et al.
Michael D. Meyer, New Orleans, LA, Attorney for Intervenor/Appellee, S.S.X., L.C.
Daniel R. Atkinson, Jr., Baton Rouge, LA, Attorney for Defendants/1st Appellants, R. B. Ammon & Associates, Inc. and Commercial Union Insurance Company.
Lindsey J. Leavoy, Baton Rouge, LA, Attorney for Defendants/2nd Appellants, CBC Temporary Staffing Services, Inc. and GAN Insurance Company.
Before: WHIPPLE, FOGG, JJ., and BAGNERIS, J. pro tempore.[1]
WHIPPLE, Judge.
This litigation involves an action to recover damages for injuries sustained by Henry Grayson, Jr. in an accident occurring on the premises of his employer. Southern Scrap. From a judgment in favor of Grayson and his wife, all parties appeal. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
Grayson was employed by Southern Scrap as a Barko crane operator. On July 11, 1995, while standing near his Barko crane, Grayson was struck in the head by a large piece of iron released from a pedestal crane operating in close proximity to *7 Grayson. The pedestal crane was being operated by Gary Knapp, a crane operator employed by CBC Temporary Staffing Services, Inc. ("CBC").
CBC was in the business of providing temporary laborers to various employers, including Southern Scrap. In its efforts to locate a crane operator for Southern Scrap, CBC had interviewed and hired Knapp. Knapp was then sent to Southern Scrap by CBC for an interview process at Southern Scrap. After approving Knapp for work in its facility, Southern Scrap assigned Knapp to various cranes in its yard in order to familiarize him with the operations of the yard. Also, during slack times, Knapp, who had no prior experience with magnet cranes, was allowed to operate these magnet cranes under the supervision of an experienced Southern Scrap crane operator.
On July 11, 1995, approximately three weeks after being assigned to the Southern Scrap yard, Knapp was sitting in one of the pedestal cranes, observing Green Miles, a Southern Scrap employee, operate the crane. When Miles was called away from the crane, Knapp began operating the crane. In attempting to release a load of scrap iron, Knapp apparently missed the designated location for release, and he inadvertently threw pieces of iron in the area of the Barko crane. Grayson was struck in the head by a large piece of iron released from the crane and suffered a compressed skull fracture with bruising of the brain.
Grayson and his wife filed suit against Knapp; CBC and its insurer, GAN Insurance Company; and R. B. Ammon & Associates, Inc. ("R. B. Ammon"), and its insurer, Commercial Insurance Company. The Graysons alleged that CBC and R. B. Ammon operated as a single business enterprise known as Temp Staffers and that, accordingly, both CBC and R. B. Ammon were liable for Knapp's negligent acts.
Following trial, the jury returned a verdict, finding that Knapp was 60% at fault in causing Grayson's injuries and that Southern Scrap was 40% at fault. The jury further found that CBC and R. B. Ammon were operated as a single business enterprise. Finally, the jury concluded that Grayson had suffered damages totaling $1,155,666.91, and that Mrs. Grayson had suffered damages of $50,000.00 for loss of consortium. Accordingly, the trial court rendered judgment against CBC, GAN Insurance Company, R. B. Ammon and Commercial Union Insurance Company in solido for the full sum of $1,205,666.91. From this judgment, all parties appeal.[2]

DENIAL OF PEREMPTORY CHALLENGES

(CBC's Assignment of Error No. 1; R. B. Ammon's Assignment of Error No. 1)
Both CBC and R. B. Ammon complain that the trial court committed legal error in denying two peremptory challenges asserted by them in an effort to strike two black females from the jury. Defendants further argue that this legal error obligates this court to set aside the jury's verdict and conduct a de novo review herein. Specifically, defendants contend that plaintiffs did not properly raise a challenge pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Additionally, defendants argue that they presented satisfactory racially-neutral explanations for exercising these peremptory challenges.
In an extension of Batson, the United States Supreme Court has held that a private litigant in a civil case may not use peremptory challenges to exclude jurors on the account of race. To do so is a violation of the Equal Protection Clause. Edmonson v. Leesville Concrete Company, Inc., 500 U.S. 614, 615, 111 S.Ct. 2077, *8 2080, 114 L.Ed.2d 660 (1991); see also Lee v. Magnolia Garden Apartments, 96-1328, p. 5 (La.App. 1st Cir.5/9/97), 694 So.2d 1142, 1146, writ denied, 97-1544 (La.9/26/97), 701 So.2d 990. To make a Batson challenge, the challenging party first must make a prima facie showing that the opposing party exercised a peremptory challenge on the basis of race. The burden then shifts to the opposing party to articulate a race-neutral explanation for striking the jurors in question which is related to the case to be tried. Batson, 476 U.S. at 96-98, 106 S.Ct. at 1723-1724. A neutral explanation is one that is based on some factor other than the race of the juror excused. In this second step of the process, the explanation need not be persuasive, or even plausible, and unless a discriminatory intent is inherent in the stated reasons, the explanation given should be deemed race-neutral. Lee, 96-1328 at p. 5, 694 So.2d at 1147.
If reasons are presented for the exercise of a peremptory challenge which are racially neutral on their face, an issue of fact is joined, and the trial court must assess the weight and credibility of that explanation in order to determine whether the party raising the Batson challenge has carried his burden of proving purposeful discrimination. In most cases, this consists of a ruling on the credibility of the attorney exercising the challenge. At this final stage, the trial court must consider the persuasiveness of the explanations. It is at this stage that implausible or fantastic justifications may be found to be pretexts for purposeful discrimination. However, the trial court's conclusion on the ultimate question of discriminatory intent is a finding of fact that is accorded great deference on appeal. Lee, 96-1328 at p. 6, 694 So.2d at 1147.
During voir dire in the instant case, the trial court ruled that it would allow the parties to "back strike," meaning that during jury selection, they could go back to a prior panel and exercise a peremptory challenge to remove a juror who had been previously accepted. At the conclusion of the voir dire for the second panel, both counsel for CBC and R. B. Ammon attempted to exercise back-strikes to peremptorily challenge two black jurors from the first panel. Additionally, the trial court reversed its earlier ruling on a challenge for cause and stated that it would excuse another black juror for medical reasons. At this point, counsel for plaintiffs objected.
In an ensuing discussion, plaintiffs' counsel noted that the juror stricken for cause and the two jurors that defendants sought to strike were all black and that with the exercise of these peremptory challenges, all black members of the jury would be stricken. The court questioned defense counsel as to any non-racial reasons they may have had for striking those two jurors. The court found the reasons stated by defense counsel to be insufficient and denied the peremptory challenges.
The record demonstrates that immediately after all three blacks were stricken from the first panel of prospective jurors, plaintiffs' counsel objected. Although plaintiffs' counsel did not specifically label the objection as a Batson challenge, it is clear from the ensuing discussion that he was objecting to defendants' use of their peremptory challenges to remove black members of the jury.
Additionally, while the trial court may not have expressly ruled that plaintiffs had made out a prima facie case of purposeful discrimination, its action of seeking race-neutral explanations from defense counsel was tantamount to a finding that plaintiff had made a prima facie showing of intentional discrimination. Accordingly, the burden was properly placed upon the defense to provide race-neutral explanations for its use of peremptory challenges against these black prospective jurors. See Lee, 96-1328 at p. 6, 694 So.2d at 1147.
Giving the great deference that we must to the trial court's factual findings herein, we cannot say that the trial court committed *9 manifest error in its ultimate decision to reject the peremptory challenges. While the trial court may not have fully stated its reasons for denying the challenges, this determination necessarily involved a credibility determination. Lee, 96-1328 at p. 6, 694 So.2d at 1147. Based upon our review of the entire voir dire proceedings herein, we find no manifest error or abuse of discretion by the trial court in its denial of the peremptory challenges of the two black female jurors.
These assignments of error lack merit.

EVIDENTIARY RULINGS

(CBC's Assignments of Error Nos. 11, 12, 13, 14 & 15; R. B. Ammon's Assignment of Error No. 4)
Numerous errors have been alleged by the parties as to various evidentiary rulings by the trial court. First, both CBC and R. B. Ammon allege that the trial court erred in refusing to allow them to cross-examine Jeff Hassenkampf, a Southern Scrap supervisor, using an accident report prepared by him and another Southern Scrap employee, and in refusing to allow defendants to introduce the report into evidence. Defendants further argue that because of this legal error by the trial court, this court should conduct a de novo review on appeal.
While part of the accident report at issue was completed by Hassenkampf, the portion of the report setting forth opinions of the safety department as to action which could be taken to prevent recurrence of this type of accident was completed by Paul Brandt. Neither Hassenkampf nor Brandt witnessed the accident. When counsel for R. B. Ammon attempted to question Hassenkampf about the opinions expressed in the report by Brandt, plaintiffs' counsel objected. Upon questioning Hassenkampf, the court determined that he had not completed that portion of the report and that the stated opinions were not Hassenkampf s. Thus, the trial court ruled that R. B. Ammon could not question Hassenkampf regarding that portion of the report and that the report would not be admitted into evidence.
Defendants contend that, pursuant to LSA-C.E. art. 801(D)(3)(a), the report was not hearsay, and, alternatively, it constituted a business record and was thus admissible pursuant to LSA-C.E. art. 803(6). Code of Evidence article 801(D)(3)(a) provides that a statement is not hearsay if it is offered against a party and is a statement by an employee of the party against whom it is offered. Initially, we note that article 801(D)(3)(a) contemplates that the statement to be admitted be made by an employee of the party against whom it is offered. The report at issue was not made by plaintiffs, but clearly was offered against plaintiffs herein. The statement was made by an employee of Southern Scrap, which remained in this suit only as an intervenor to collect workers' compensation benefits paid and which did not participate in the trial.
Additionally, with regard to the business records exception set forth in Code of Evidence article 803(6), we find no error in the trial court's finding that the accident report, setting forth opinions as to the cause of the accident, did not constitute the type of business record contemplated by this exception to the hearsay rule. Article 803(6) provides that business records are an exception to the hearsay rule where the proponent can establish they were: (1) made at or near the time by, or from information transmitted by, (2) a person with knowledge, (3) made and kept in the course of a regularly-conducted business activity, and (4) that it was the regular practice of that business activity to make and to keep the information. Additionally, the proponent must show that the recorded information was furnished in circumstances under which the statement would not be excluded by the hearsay rule. National Information Services v. Gottsegen, 98-528, p. 6 (La.App. 5th Cir.6/1/99), 737 So.2d 909, 914, writs denied, 99-1936, 99-2366 (La.10/8/99), 751 So.2d 226, 228. *10 The statements at issue herein were not merely records of a regularly-conducted business activity pertaining to the nature of the business. Instead, they constituted opinions by an individual who did not witness the accident and who was not called to testify at trial to explain how he arrived at his opinions.
The trial court is granted a broad range of discretion when ruling on the admissibility of evidence, and evidentiary rulings shall not be disturbed on appeal absent a clear abuse of that discretion. Fontana v. Louisiana Sheriffs' Automobile Risk Program, 96-1579, p. 7 (La.App. 1st Cir.6/20/97), 697 So.2d 1030, 1034, writ denied, 97-2363 (La.1/9/98), 705 So.2d 1088. Considering the foregoing, we find no abuse of that discretion.
CBC additionally complains that the trial court erred in refusing to allow certain testimony it sought to elicit and in refusing to admit plaintiffs' petitions, which CBC contends was offered in an attempt to establish that the Southern Scrap facility was operating in an unsafe manner.
Specifically, CBC attempted to call Tim Hogan, a former Southern Scrap employee, for the purpose of establishing that crane operators at Southern Scrap engaged in the practice of "slinging steel." Plaintiffs objected on the basis that Hogan had not been identified in any discovery responses, was not listed as a witness in the pretrial order and had not witnessed Grayson's accident. Accordingly, the court refused to permit Hogan to testify.
The trial judge has much discretion in conducting a trial and is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. LSA-C.C.P. art. 1631. The theories inherent in the pre-trial procedure, to avoid surprise and allow orderly disposition of the case, constitute sufficient reasons for allowing the trial judge to require adherence to the pre-trial order. Combs v. Hartford Insurance Company, 544 So.2d 583, 586 (La.App. 1st Cir.), writ denied, 550 So.2d 630 (La.1989). Although the trial court is vested with much discretion to amend its pre-trial order, this discretion must be exercised to prevent substantial injustice to the parties who have relied on the pre-trial rulings and structured the preparation and presentation of their cases accordingly. Highlands Underwriters Insurance Company, 96-1018, p. 5 (La.App. 1st Cir.3/27/97), 691 So.2d 1336, 1339. Considering these principles, we find no abuse of the trial court's discretion in refusing to amend the pre-trial order.
Additionally, with regard to CBC's attempt to elicit testimony from Richard Ammon, owner of R. B. Ammon, concerning the alleged reason he ceased supplying Southern Scrap with temporary employees at some point after this accident, we likewise find no abuse of the trial court's discretion. The court was within its discretion in determining that this evidence was irrelevant to the issues before the jury and unfairly prejudicial. Likewise, we find no abuse of the trial court's discretion in refusing to allow CBC to offer plaintiffs' petition, and the allegations made therein, as evidentiary proof of the facts to be determined in this matter.
Finally, CBC contends that the trial court erred in allowing plaintiffs to call Green Miles to testify, because Miles was not listed as a witness by plaintiffs in the pre-trial order. However, we note that while plaintiffs did not list Miles as a witness in their list, he was in fact listed as a witness on the pre-trial order by CBC. Thus, CBC's argument that it was prejudiced by not being allowed to properly prepare a defense to Miles' testimony is without merit.
These assignments of error lack merit.

JURY VERDICT FORM AND JURY CHARGES

(R. B. Ammon's Assignment of Error No. 5; CBC's Assignments of Error Nos. 2, 4 & 9)
Both CBC and R. B. Ammon contend that the trial court erred in refusing *11 to allow the jury to apportion fault on the verdict form to all responsible parties, thus requiring this court to conduct a de novo review.
The jury verdict form herein included separate interrogatories asking whether Knapp, Grayson and "any employee" of Southern Scrap were guilty of negligence and whether that negligence was a cause of Grayson's injuries. The verdict form then contained a section permitting the jury to apportion fault among Knapp, Grayson and Southern Scrap.
Defendants contend that because the trial court did not specifically list each individual employee of Southern Scrap who could have been responsible in part for Grayson's injuries, the court violated the provisions of LSA-C.C.P. art. 1812 and LSA-C.C. art. 2323. Pursuant to LSA-C.C.P. art. 1812, as amended in 1996, the court shall, upon the request of any party, submit to the jury special written interrogatories inquiring as to the fault of both parties and non-parties. Additionally, LSA-C.C. art. 2323, also as amended in 1996, mandates that a determination be made as to the percentage of fault of all persons contributing to the accident. Keith v. U.S. Fidelity and Guaranty Company, 96-2075, p. 5 (La.5/9/97), 694 So.2d 180, 182.
However, based upon our review of the jury verdict form herein, we find no violation of these principles. The jury was clearly given the opportunity to find fault on the part of "any" Southern Scrap employee. Additionally, the trial court expressly instructed the jury that it could assign fault to persons who were not a party to the suit and that an employer was liable for the negligence of its employees. Thus, considering the instructions and the jury verdict form employed herein, upon finding that any of the Southern Scrap employees were at fault in causing the accident, the jury clearly was then given the opportunity to apportion the fault of those employees to Southern Scrap.
Within the guidelines of LSA-C.C.P. art. 1812, the trial court is given wide discretion in framing questions to be posed as special jury interrogatories, and absent some abuse of that discretion, this court will not set aside those determinations. Citgo Petroleum Corporation v. Yeargin, Inc., 95-1574, p. 31 (La.App. 3rd Cir.2/19/97), 690 So.2d 154, 172, writs denied, 97-1223, 97-1245 (La.9/19/97), 701 So.2d 169, 170; Tramontin v. Glass, 95-744, pp. 11-12 (La.App. 5th Cir.1/30/96), 668 So.2d 1252, 1258. Because the jury verdict form allowed the jury to assign fault to Southern Scrap and its employees, we find no abuse of the trial court's discretion in its determination as to how to frame a particular jury interrogatory.
CBC also complains that the trial court erred in not requiring the jury to apportion the vicarious liability of Knapp among CBC, R. B. Ammon and Southern Scrap. However, as discussed more fully below, the Supreme Court has specifically held that where a general employer is engaged in the business of hiring out its employees under the supervision of another employer, the general employer remains liable for the torts of the "borrowed" employees. Morgan v. ABC Manufacturer, 97-0956, p. 13 (La.5/1/98), 710 So.2d 1077, 1084. Thus, there is no legal basis for requiring that the jury verdict form be fashioned to allow the jury to apportion vicarious liability among Knapp's general and borrowing employers.
This argument lacks merit.
Additionally, we find no merit to CBC's contention that the trial court erred in its instructions to the jury on the issue of respondeat superior. In Morgan, the majority held that an employer is liable for any tort of its employees regardless of the employer's ability to prevent the act. Morgan, 97-0956 at p. 5, 710 So.2d at 1080. Nonetheless, relying upon Justice Traylor's dissent in Morgan, CBC argues that the trial court erred in failing to instruct *12 the jury that, pursuant to LSA-C.C. art. 2320, an employer is only liable for those acts which it might have prevented. Applying the Supreme Court's pronouncements in Morgan, we can find no error in the trial court's refusal to give the instruction requested by CBC.
Having found no merit to the above-alleged errors which defendants contend interdicted the jury's fact-finding process, we now proceed to review the jury's findings under the appropriate standards of manifest error and abuse of discretion.

FAULT OF THE PARTIES AND APPORTIONMENT OF FAULT

(R. B. Ammon's Assignment of Error No. 6; CBC's Assignments of Error Nos. 5 & 8; Plaintiffs' Assignment of Error No. 2)
CBC and R. B. Ammon both complair that the jury committed manifest error in failing to apportion a higher percentage of fault to Southern Scrap. CBC additionally asserts that the jury erred in failing to assign any fault to Grayson in allegedly contributing to his own injuries. Finally, plaintiffs contend that the jury erred in not apportioning 100% of the fault to Knapp.
Determinations of apportionment of fault are questions of fact subject to the manifest error standard of review. Ly v. State, Through Department of Public Safety and Corrections, 633 So.2d 197, 203 (La.App. 1st Cir.1993), writ denied, 93-3134 (La.2/25/94), 634 So.2d 835. Based upon our review of the record herein, we find no manifest error in the jury's findings of fault or in its apportionment of fault.
The record reveals that the Southern Scrap, a company engaged in metal recycling, has several cranes operating at its Baton Rouge facility, including five pedestal cranes, which are large, stationary cranes, and Barko cranes, which are smaller and move on a track. These cranes are used to unload scrap metal transported to the facility, sort the scrap, feed the metal into hydraulic shearers, which cut the metal into five-foot by two-foot pieces, and load scrap metal onto trucks for shipment.
On the day of the accident, Knapp, as a new temporary employee, was seated in one of the pedestal cranes, observing the operation of the crane by Green Miles. At some point, Miles received a radio call from his supervisor, Jeff Hassenkampf, requesting that he report to the office. According to Knapp, when Miles exited the crane, he asked Knapp "to take his place." Miles, on the other hand, testified that he told Knapp that he would be right back and denied having told Knapp to operate the crane in his absence. Nonetheless, after Miles exited the crane, Knapp did begin operating the crane.
Grayson was operating his Barko crane in the vicinity of the pedestal crane Knapp was operating, when the Barko began overheating. Grayson went to speak to the yard foreman about the problem, and Henry Bell, Jr., a Southern Scrap maintenance mechanic, was then sent into the yard to repair the Barko. Bell came out into the yard and spoke to Grayson about the problem. According to Bell, while standing about four or five feet away from the Barko, Bell got Knapp's attention in the pedestal crane and gave him a stop signal by waving his hands in a crossing motion above his head. Bell stated the signal was intended to alert Knapp to the fact that he would be working on the Barko and to indicate to Knapp that he should stop placing materials on the pile closest to the Barko. Bell stated that from where he was standing, he could clearly see Knapp, and Knapp could see him. Bell then waited for Knapp to rotate the crane around and again gave Knapp the signal.
According to Bell, Knapp was looking directly at Bell when Bell gave him the second signal, and Knapp acknowledged that he had seen Bell by giving a "hands *13 down" signal. Bell understood that signal to mean that Knapp had seen him and Grayson, and at that point, Bell felt that it was safe to work on the Barko. He then began working on the Barko, and Grayson stood beside the Barko on the tracks to assist Bell.
Knapp, on the other hand, testified that he understood Bell to be indicating that he wanted Knapp to drop a load of metal near the Barko. Nonetheless, regardless of Knapp's understanding of what Bell intended by the signals, Knapp acknowledged that he had been aware of the location of the Barko and that he had missed his intended mark when the piece of iron struck Grayson. He explained that he intended to place the load approximately ten feet away from the location where Grayson was standing. However, he explained that he was not familiar enough with the crane to have the "feel" of the magnet and did not know exactly when to turn off the magnet in order to place the load where he intended. Because of his inexperience in operating a magnet crane, Knapp misjudged the magnet release, and a large piece of metal was "slung" off the magnet, striking Grayson in the head.
In reviewing the jury's findings and apportionment of fault, we note that there was conflicting testimony as to whether there was training in hand signaling at the Southern Scrap facility, whether Miles had asked Knapp to operate the crane in his absence and what Knapp understood Bell's signal to mean. However, what is undisputed is that Knapp was aware of the location of the Barko crane in proximity to the pedestal crane he was operating, that Knapp had seen Bell working on the crane prior to the accident and that Knapp had not intended to sling the load of metal in the manner in which he did when Grayson was struck. Given these established facts and giving deference to the credibility determinations the jury was required to make, we find no manifest error in the jury's findings that Grayson was not at fault in causing the accident, Knapp was 60% at fault and Southern Scrap was 40% at fault.
These assignments of error also lack merit.

SINGLE BUSINESS ENTERPRISE

(R. B. Ammon's Assignment of Error No. 2; Plaintiffs' Assignment of Error No. 3)
R. B. Ammon contends that the evidence presented at trial fails to establish that it operated as a single business enterprise with CBC, as would establish liability on the part of R. B. Ammon, in addition to CBC, for the actions of Knapp. Specifically, R. B. Ammon contends that the trial court erred in failing to properly instruct the jury on this issue. It asserts that while the court properly instructed the jury that the existence of a single business enterprise must be established by clear and convincing evidence, it then failed to define the "clear and convincing" standard for the jury. Additionally, R. B. Ammon argues that the trial court erred in denying its motion for directed verdict on the issue, and that the jury's finding that a single business enterprise existed was clearly erroneous.
On the other hand, while plaintiffs do not challenge the jury's finding that a single business enterprise existed, they argue that the trial court erred in instructing the jury that the existence of a single business enterprise must be established by clear and convincing evidence.
Turning first to the question of burden of proof, plaintiffs assert that the jurisprudence has not imposed the higher burden of clear and convincing evidence upon a party seeking to establish the existence of a single business enterprise. At trial, R. B. Ammon contended that the burden of proof was clear and convincing evidence, analogizing to a situation where a party seeks to "pierce the corporate veil." The trial court agreed, and we find no error in that determination.
*14 In Louisiana, corporations are generally recognized as separate entities. However, the legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation. If one corporation is wholly under the control of another, the fact that it is a separate entity does not relieve the latter from liability. In such an instance, the former corporation is merely an alter ego or a business conduit of the latter. Green v. Champion Insurance Company, 577 So.2d 249, 257 (La.App. 1st Cir.), writ denied, 580 So.2d 668 (La.1991).
Thus, as this court held in Green, when corporations represent precisely the same single interest, the court is free to disregard their separate corporate identity. Green, 577 So.2d at 257. As also noted therein, courts can pierce the veil of a corporation in order to reach the "alter egos" of the corporate defendant, especially where the corporations constitute a single business. Thus, in addition to the traditional "piercing the veil" theory to disregard a corporate identity, the court in Green utilized the "single business enterprise" or "instrumentality" theory to extend liability beyond a separate entity. Green, 577 So.2d at 257-258. As instructed therein, in determining whether a group of entities constitutes a single business enterprise, certain factors similar to the factors used in "piercing the corporate veil" cases should be utilized. Green, 577 So.2d at 257-258.
Thus, while this court in Green did not specifically set forth the burden of proof required to establish the existence of a single business enterprise, we clearly associated the "single business enterprise" theory with the traditional "piercing the corporate veil" theory. As further noted by this court in Harris v. Best of America, Inc., 466 So.2d 1309, 1315 (La.App. 1st Cir.1985), because Louisiana considers the concept of the corporation beneficial, the principle that the corporation is a separate entity should be disregarded only in exceptional circumstances. Because the separateness of the corporate entity is disregarded in both the "single business enterprise" theory and the "piercing the corporate veil" theory, it is reasonable to conclude that the two theories should both be subjected to the same burden of proof, i.e., clear and convincing evidence. See Harris, 466 So.2d at 1316. Accordingly, we find no error in the trial court's instruction to the jury that, in order to prevail, plaintiffs had to prove the existence of a single business enterprise by clear and convincing evidence.
Additionally, we find no error in the trial court's refusal to further define "clear and convincing" to the jury as requested by R. B. Ammon. A trial judge has the duty to charge the jury as to the law which applies in a case and the responsibility to reduce the possibility of confusing the jury. Moore v. Safeway, Inc., 95-1552 (La.App. 1st Cir.11/22/96), 700 So.2d 831, 841, writs denied, 97-2927, 97-3000 (La.2/6/98), 709 So.2d 735, 744. The judge is not required to give the precise instruction submitted by either party, but must give instructions which properly reflect the law applicable in light of the facts of the particular case. Boncosky Services, Inc. v. Lampo, 98-2239, p. 9 (La.App. 1st Cir.11/5/99), 751 So.2d 278, 285, writ denied, 00-0322 (La.3/24/00), 758 So.2d 798.
Adequate instructions are those instructions which fairly and reasonably point up the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application thereto. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Moreover, an appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Boncosky Services, Inc., 98-2239 at p. 9, 751 So.2d at 285.
*15 In declining to give the instruction submitted by R. B. Ammon, which purported to define "clear and convincing," the trial court stated that it believed the instruction would only add confusion and that the standard was self-explanatory and needed no further definition. Based upon our review of the jury instructions herein, we conclude that the trial court's instructions properly reflected the applicable law, and we find no abuse of the trial court's discretion in declining to give any further instruction on this issue as requested by R. B. Ammon.
Thus, we turn our analysis to R. B. Ammon's contention that the trial court manifestly erred in concluding that it operated as a single business enterprise with CBC. At the outset, we again note that courts have been unwilling to allow affiliated corporations that are not directly involved to escape liability simply because of business fragmentation. Thus, where a single corporation has been fragmented into branches that are separately incorporated and are managed by a dominant or parent entity, or have interlocking directorates, the courts have held the dominant or parent corporation liable for the obligations of its branches whenever justice requires protection of the rights of third persons. Green, 577 So.2d at 257.
When determining whether a corporation is an alter ego, agent, tool or instrumentality of another corporation, the court is required to look to the substance of the corporate structure rather than its form. The following factors may be considered in determining whether a group of entities constitute a "single business enterprise":
(1) corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;
(2) common directors or officers;
(3) unified administrative control of corporations whose business functions are similar or supplementary;
(4) directors and officers of one corporation act independently in the interest of that corporation;
(5) corporation financing another corporation;
(6) inadequate capitalization ("thin incorporation");
(7) corporation causing the incorporation of another affiliated corporation;
(8) corporation paying the salaries and other expenses or losses of another corporation;
(9) receiving no business other than that given to it by its affiliated corporations;
(10) corporation using the property of another corporation as its own;
(11) noncompliance with corporate formalities;
(12) common employees;
(13) services rendered by the employees of one corporation on behalf of another corporation;
(14) common offices;
(15) centralized accounting;
(16) undocumented transfers of funds between corporations;
(17) unclear allocation of profits and losses between corporations; and
(18) excessive fragmentation of a single enterprise into separate corporations.
Green, 577 So.2d at 257-258. This list is illustrative and is not intended as an exhaustive list of relevant factors. Moreover, no one factor is dispositive of the issue of "single business enterprise." Green, 577 So.2d at 258.
Whether an affiliated group of entities constitutes a "single business enterprise" is a question of fact to be decided by the trial court. Brown v. Automotive Casualty Insurance Company, 93-2169, p. 8 (La.App. 1st Cir.10/7/94), 644 So.2d 723, 728, writ denied, 94-2748 (La.1/6/95), 648 So.2d 932. For an appellate court to reverse a factual finding, it must find from *16 the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
Considering the above-outlined factors and the scope of our review on appeal, we conclude that the record contains ample evidence to support the jury's finding that R. B. Ammon and CBC operated as a single business enterprise. The record reflects that Richard Ammon entered into the temporary employment business in 1984, when he incorporated R. B. Ammon & Associates, Inc., which operated under the trade name "Temp Staffers." At that time, R. B. Ammon supplied both clerical and labor employees. However, because the expense of workers' compensation coverage for labor employees affected its overall workers' compensation rates. Ammon decided that R. B. Ammon would separate its clerical and labor business.
At that point, Mr. Ammon encouraged his young, college-aged nephew, Chevis Comeaux, to form a corporation to provide temporary labor employees, with R. B. Ammon continuing to provide only temporary clerical employees.[3] Comeaux then formed CBC Temporary Staffing Services, Inc., with Comeaux owning all of the stock in the corporation.
However, shortly after CBC was incorporated, Comeaux moved to Oregon. He was not called to testify at the trial herein regarding the operations of his corporation. Nonetheless, the record demonstrates that Mr. Ammon handled all the day-to-day operations for CBC. Moreover, although Mr. Ammon denied that CBC also used the trade name "Temp Staffers," the record contains ample evidence to support the conclusion that both corporations operated under this common trade name.
Additionally, CBC and R. B. Ammon shared the same office and computer system. CBC had no regular employees other than Comeaux, and all of the daily operations for CBC were handled by R. B. Ammon employees. For instance, the clerical staff for R. B. Ammon answered the phone for CBC, and R. B. Ammon's personnel recruiters interviewed prospective temporary employees for CBC and sent these temporary employees on job assignments for CBC. Moreover, R. B. Ammon billed CBC's clients. CBC did not directly reimburse R. B. Ammon for any of these services.
Business documents were introduced and show that the business documents used by CBC and R. B. Ammon listed the name of both corporations in addition to the trade name "Temp Staffers." Although Mr. Ammon attempted to characterize CBC as a mere a "client" of R. B. Ammon, it is clear that the relationship between these two corporations was much more complex. A review of the testimony and documentary evidence amply supports the jury's factual determination that these two corporations were being operated as a single business enterprise known as "Temp Staffers," with Mr. Ammon controlling the operations for both corporations.
These assignments of error also lack merit.

VICARIOUS LIABILITY OF R. B. AMMON AND CBC

(R. B. Ammon's Assignment of Error No. 3; CBC's Assignment of Error No. 3; Plaintiffs' Assignment of Error No. 1)
CBC and R. B. Ammon further contend that because Knapp was the borrowed employee of Southern Scrap who exercised total control over his activities, they, as the lending employers, should not be vicariously liable for Knapp's actions. We disagree.
Recently, in Morgan, the Supreme Court held that where a general employer *17 is engaged in the business of hiring out its employees under the supervision of another employer, the general employer remains liable for the torts of the "borrowed" employees. Morgan, 97-0956 at p. 1, 710 So.2d at 1078. In Morgan, a laborer employed by Worktec, a temporary labor service, had been assigned to work at Goldin Industries. While operating a crane under the direction of Goldin Industries, the temporary laborer dropped a piece of scrap metal, which seriously injured a Goldin Industries employee. Morgan, 97-0956 at p. 2, 710 So.2d at 1078.
In finding Worktec liable for the negligence of its employee assigned to Goldin Industries, the Court reaffirmed the principle of "dual employers." The Court further stated that for an employer in the business of hiring out its employees, the labor of its loaned employees is the company's product. Thus, the Court concluded, the temporary labor services employer should bear the expenses and risks associated with its product, in addition to reaping the benefits derived therefrom. Morgan, 97-0956 at p. 12-13, 710 So.2d at 1084.
We find Morgan to be factually and legally on point, and, accordingly, find no merit in defendants' arguments that they should not be held vicariously liable for Knapp's actions.[4]

FAILURE TO REDUCE PLAINTIFFS' AND SOUTHERN SCRAP'S AWARDS BY SOUTHERN SCRAP'S PERCENTAGE OF FAULT

(R. B. Ammon's Assignment of Error No. 7; CBC's Assignments of Error Nos. 6 & 10)
R. B. Ammon and CBC assert that the trial court erred in failing to reduce the plaintiffs' recovery by the percentage of fault assessed to Southern Scrap, Grayson's employer. CBC further contends that the trial court erred in failing to reduce Southern Scrap's award of reimbursement of compensation benefits it paid by the percentage of its own fault. With regard to reduction of plaintiffs' recovery, defendants argue that pursuant to LSA-C.C. art. 2323, as amended in 1996, the employer's fault was required to be apportioned, and plaintiffs' recovery should have been reduced by that percentage of fault.
With regard to Southern Scrap's reimbursement claim, CBC contends that pursuant to LSA-R.S. 23:1101(B), an employer's recovery of workers' compensation benefits against a third person must be limited to the percentage of recovery of the employee against the third person. Thus, CBC argues, because plaintiffs' recovery should have been reduced by the percentage of fault attributed to Mr. Grayson's employer, Southern Scrap, Southern Scrap's recovery should have been likewise reduced.
We first address defendants' contention that plaintiffs' recovery should have been reduced by the percentage of fault assessed against Southern Scrap. Mr. Grayson's employer. Since 1991, the Louisiana Supreme Court has rendered several opinions concerning the quantification of employer fault in third-party tort actions, pursuant to LSA-C.C.P. art. 1812(C) and LSA-C.C. art. 2324(B). In Keith v. United States Fidelity & Guaranty Company, 96-2075, pp. 3-4 (La.5/9/97), 694 So.2d 180, 181-182 the court discussed the development of the jurisprudence on this subject.
*18 The Court noted that in Guidry v. Frank Guidry Oil Co., 579 So.2d 947, 953-954 (La.1991), it had held that the worker's compensation principle made the concept of employer fault excludable in tort actions against third-parties tortfeasors. Shortly thereafter, in Gauthier v. O'Brien, 618 So.2d 825, 831 (La.1993), the Court overruled Guidry and determined that LSA-C.C. art. 2324(B) mandated the quantification of employer fault. However, the Court went on to hold that while employer fault must be quantified by a jury to enable the jury to reach a fairer determination of the relative fault of all blameworthy parties, the judge, after the jury had returned a verdict, should disregard the proportion of fault assessed to the employer and reallot the proportionate fault to all other blameworthy parties. Gauthier, 618 So.2d at 833.
Subsequently, in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95), 657 So.2d 975, the Court rejected its holding in Gauthier and reinstated its prior determination in Guidry that excluded the quantification of employer fault. Keith, 96-2075 at p. 3, 694 So.2d at 181.
However, in Acts 1996, 1st Ex. Sess., No. 3, Sec. 1, effective April 16, 1996, the Legislature amended LSA-C.C. art. 2323 to expressly provide that the degree of fault of all persons shall be determined, regardless of the person's immunity by statute, including immunity as provided by LSA-R.S. 23:1032 of the workers' compensation law.
Additionally, LSA-C.C. art. 2324(B) was amended at the same time to provide that except as to intentional or willful acts, liability for damages caused by two or more person shall be a joint and divisible obligation. The amended paragraph further provides that:
A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, ... regardless of such other person's ... immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032.
In Keith, the Court considered the amendments to LSA-C.C. art. 2323 and held that the clear pronouncement of the legislature invalidated the holdings in Cavalier as to the quantification of fault of nonparties, and that the 1996 amendment to LSA-C.C. art. 2323 was procedural and should be applied retroactively. The Court stated, "Viewing the applicability of Act 3 to the case sub judice, it is clear that the substantive right to allocate fault was created in 1979 with the introduction of comparative fault. Act 3 simply delineates a method for enforcing that substantive right as particularly applied to the statutory employer." Keith, 96-2075 at p. 7, 694 So.2d at 183. However, in a concurring opinion, Justice Calogero noted that the issue of whether the quantification of the employer's fault can be used to reduce the amount the plaintiff can recover (apparently pursuant to the amended version of LSA-C.C. art. 2324(B)) was "reserved for another day."
Subsequently, in Aucoin v. State, Through Department of Transportation and Development, 97-1938, 97-1967, pp. 8-10 (La.4/24/98), 712 So.2d 62, 67-68, the Court addressed the retroactivity of the 1996 amendments to LSA-C.C. art. 2324(B). Under facts which did not involve quantification of employer fault, the portion of article 2324(B) at issue was the revocation of solidary liability of joint tortfeasors. In determining that the amended version of LSA-C.C. art. 2324(B) applied prospectively only, the Court held that "since the amendment resulted in changing the amount of damages recoverable, the change was clearly substantive." Aucoin, 97-1938, 97-1967 at pp. 9-10, 712 So.2d at 67. The Court determined that the applicable article was that which existed at the time of the accident. Aucoin, 97-1938, 97-1967 at p. 10, 712 So.2d at 67.
*19 Although Aucoin did not deal with quantification of employer fault under LSA-C.C. art. 2324(B), the Fifth Circuit Court of Appeal has applied the Supreme Court's pronouncements in Aucoin to the issue of reduction of an employee's award by the percentage of fault of the employer. Lacrouts v. Future Abrasives, Inc., 99-583, p. 10 (La.App. 5th Cir.11/10/99), 750 So.2d 1063, 1068-1069, writ denied, 99-3484 (La.2/11/00), 754 So.2d 941. The appellate court concluded that the amended version of LSA-C.C. art. 2324(B), relating to the apportionment of liability for payment of damages, was to be given prospective effect only. Consequently, because the accident at issue therein had predated the amendments, the court determined that the matter was controlled by Cavalier, the law in effect at the time of the accident. Lacrouts, 99-583 at p. 10, 750 So.2d at 1069.
Similarly, in Johnson v. Rogers & Phillips, Inc., 99-0116, pp. 1-2 (La.App. 4th Cir.7/21/99), 753 So.2d 286, 295-296 (on rehearing), the Fourth Circuit Court of Appeal held that because the 1996 amended version of LSA-C.C. art. 2324(B) was to be applied prospectively only, the law in effect at the time of the accident governed the issue of reallocation of an immune employer's fault. Because the accident occurred in 1994, the court applied the ratio approach of Gauthier, the controlling law at that time, to reallocate the employer's fault. Johnson, 99-0116 at pp. 1-2, 753 So.2d at 296.
In the instant case, on a motion to clarify the judgment, the trial court ruled that the 1996 amendments to article 2324 did not apply retroactively. Accordingly, the trial court ruled that it would apply the ratio approach of Gauthier, the applicable law at the time of Grayson's accident, to reallocate the fault of Southern Scrap. Because Grayson was not at fault in causing the accident, the fault of Southern Scrap was reallocated to CBC.
Considering the Supreme Court's pronouncements in Aucoin, as well as the other relevant jurisprudence on this issue, we find no error in the trial court's determination that Southern Scrap's fault should be reallocated to CBC. Thus, applying Gauthier, the trial court was correct in refusing to reduce plaintiffs' recovery by the percentage of fault of Southern Scrap.
Finally, we turn to CBC's contention that Southern Scrap's recovery of worker's compensation benefits paid should have been reduced by its percentage of fault. CBC relies upon LSA-R.S. 23:1101(B), which at the time of Grayson's accident, provided as follows:
Any person having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit against such third person to recover any amount which he has paid or becomes obligated to pay as compensation to such employee or his dependents. The recovery allowed herein shall be identical in percentage to the recovery of the employee or his dependents against the third person and, where the recovery of the employee is decreased as a result of comparative negligence, the recovery of the person who has paid compensation or has become obligated to pay compensation shall be reduced by the same percentage. (Emphasis added).
CBC argues that, because plaintiffs' fault should have been reduced by the percentage of Southern Scrap's fault, Southern Scrap's award should likewise be reduced to reflect the same percentage of recovery as plaintiffs. Because we find no merit to the contention that plaintiffs' recovery should have been reduced by the percentage of fault assigned to Southern Scrap, we likewise find no merit to this contention. If, as provided in LSA-R.S. 23:1101(B), Southern Scrap is entitled to an award in the same percentage as plaintiffs, Southern Scrap is entitled to 100% of its award, as the judgment herein provides.[5] *20 This assignment of error also lacks merit.

DAMAGES
Defendants also challenge the damage award herein, contending that the jury abused its discretion in awarding excessive general damages, loss of consortium damages, damages for future medical expenses, and damages for loss of earning capacity. The general damages awarded to Mr. Grayson were as follows: $250,000.00 for physical pain and suffering; $250,000.00 for mental pain and suffering; and $275,000.00 for loss of earning capacity. The jury also awarded Mr. Grayson $25,000.00 for future medical and rehabilitative expenses. Additionally, Mrs. Grayson was awarded $50,000.00 for loss of consortium.

General Damages
The trier of fact is accorded much discretion in fixing general damage awards. LSA-C.C. art. 2324.1; Cheramie v. Horst, 93-1168, p. 6 (La.App. 1st Cir.5/20/94), 637 So.2d 720, 723. The discretion vested in the trier of fact is great, "even vast," so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Youn, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Youn, 623 So.2d at 1261.
If the appellate court finds from the record that the trier of fact abused its discretion in awarding damages, the award may be disturbed only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded the trier of fact. Bosworth v. Authement, 634 So.2d 1205, 1207 (La.App. 1st Cir.1993), writ denied, 94-0002 (La.3/11/94), 634 So.2d 836.
As a result of being struck in the head by a falling piece of iron weighing as much as 300 pounds, Mr. Grayson lost consciousness and was transported by ambulance to Baton Rouge Medical Center. In the emergency room, Grayson complained of head pain, right ear pain, right shoulder pain, neck pain and the inability to move his left arm and hand.
Grayson was treated in the emergency room by Dr. Allen Joseph, a neurosurgeon. Grayson was diagnosed as having sustained a focal skull fracture with fractures radiating outward from the point of impact; skull fragments penetrating the dura, the covering of the brain; bruising to the brain; a subarachnoid hemorrhage, involving bleeding on the surface of the brain; and a laceration to the right forearm requiring sutures. Dr. Joseph described the skull fracture as compound, involving laceration of the area; comminuted, involving multiple bone fragments; and depressed, meaning the skull fracture was "pushed in." Dr. Joseph ordered a CT scan of the cervical spine, which revealed that Grayson also had sustained a *21 moderate disc rupture at C5-C6, and a possible fracture of the vertebra.
At that point, the patient was confined for a period of observation to determine whether the area of the brain contusion would enlarge to the extent that it would require surgical intervention or whether the required surgery could be limited to removing the skull fragments and attempting to normalize the contour of the skull. Thus, the wound was cleaned and sutured, and a regimen of antibiotic drugs was administered to prevent infection.
Because testing revealed pressure being placed on the brain by the depression of the skull, Grayson ultimately required surgery to re-contour his skull and release pressure from the brain. The surgical procedure involved opening the wound, identifying and removing skull fragments that were broken off, suturing the laceration to the dura and re-contouring the remaining fragments of plaintiff's skull.
Although the surgery went reasonably well, Grayson continued to demonstrate marked weakness on the left side, particularly in the face, hand and leg. Dr. Joseph described Grayson's hand as "paw like," explaining that while Grayson could probably use his hand like a scoop or an artificial hand, he had lost his fine motor skills in that hand.
Grayson remained hospitalized for eight days, and after his release from the hospital, a home health care nurse was required to go to his home daily for continuing care and intravenous administration of antibiotics. Through a course of physical therapy, Grayson was able to regain some motion in his left arm; however, his loss of fine motors skills involving the left hand is permanent. This permanent physical disability prevents Grayson from ever returning to work as a crane operator.
In addition to these physical injuries, Grayson experienced significant emotional problems following the accident. Dr. William Drew Gouvier, a neuropsychologist, evaluated Grayson and diagnosed his mental condition as chronic adjustment disorder with mixed anxiety and depression. Dr. Gouvier explained that every time Grayson attempts to use his hand, he is again reminded of his injuries and his disability. Dr. Gouvier noted that Grayson had always been a hard-working man and that Grayson had based his self-worth on his ability to support his family. Due to his permanent disabilities, he is no longer able to perform his former job. Instead, in a job created for him by Southern Scrap, Grayson now hands out hard hats to visitors of the facility. As Mrs. Grayson explained, Grayson has shown great difficulty in accepting this job, which makes him feel belittled or inadequate. Additionally, because of his brain injury, Grayson also fatigues more easily, and towards the end of the day, this fatigue causes him to become increasingly irritable.
According to Dr. Gouvier, in addition to the emotional problems that Grayson has experienced and continues to experience in attempting to deal with his injury and resulting disability, Grayson has sustained cognitive deficits as a result of the accident. Although this finding was disputed by defendants' expert, Dr. Gouvier concluded, based on testing he performed, that Grayson suffers from visual memory deficits and attention and concentration problems.
Mrs. Grayson also testified that, since the accident, Mr. Grayson gets angry more easily and becomes frustrated by his helplessness. According to Mrs. Grayson, her husband is now withdrawn and will not communicate with her as he did before the accident. When he gets home from work, he goes to his room and watches television. He no longer eats his meals with the family because he does not want anyone to witness the difficulty he has in feeding himself. She stated that Grayson simply does not interact with his family as he did before the accident, due to his physical disabilities and his emotional problems.
Considering the foregoing, and the record as a whole, and mindful of the principles *22 which govern our review of this matter, we are unable to say that the jury abused its discretion in its award general damages herein. Although the award is on the high side, we are unable to say it is abusively so, considering the significance of the injuries he sustained and their profound and detrimental impact upon his life.

Loss of Earning Capacity
It is well established that an award for loss of future earning capacity is not merely predicated upon the difference between a plaintiff's earnings before and after a disabling injury. Rather, the award is predicated upon the difference between a plaintiff's earning capacity before and after a disabling injury. Martino v. Sunrall, 619 So.2d 87, 90 (La.App. 1st Cir.), writ denied, 621 So.2d 821 (La. 1993). Moreover, awards for loss of earning capacity are speculative by nature and cannot be calculated with mathematical certainty. Therefore, the trier of fact necessarily must have much discretion in fixing these awards. Martino, 619 So.2d at 90.
As stated above, Grayson is still employed by Southern Scrap. However, because his disabilities prevent him from performing anything other than sedentary or light work, Southern Scrap created a position for him within his limitations at an hourly rate of pay comparable to what he earned at the time of the accident. His primary function now is to hand out hard hats to customers visiting the facility, a position which had never previously existed at Southern Scrap. However, while Grayson earns a comparable wage rate in this new position, he is no longer able to earn the overtime pay which had been available to him as a crane operator.
John Theriot, a certified public accountant, testified as to Grayson's loss of future earning capacity. He noted that in 1995, before his injury, Grayson had earned $16,500.00, which, when annualized, yielded annual earnings of $32,000.00.
Theriot further calculated annual earnings at Grayson's present hourly rate, with no overtime pay, which he determined would be $18,000.00. Thus, he concluded that Grayson had suffered a loss of future earnings of $160,000.00. He further calculated that Grayson had suffered a loss of future household services which he valued as totaling $125,000.00.
Moreover, there was further evidence introduced to establish that if Grayson lost his sheltered position at Southern Scrap for any reason, Grayson's physical disability combined with his educational level, cognitive problems and irritability will make it significantly more difficult to find and maintain other employment. Additionally, Louis Lipinski, a vocational rehabilitation expert, testified that Grayson's injuries will probably prevent him from participating in the labor market at a rate of 100%, given that he may go through a series of jobs with some periods of unemployment. In his opinion, Grayson would probably be able to participate in the labor market at between 50% and 75% participation. He further opined that Grayson would only be capable of earning $5.15 per hour.
Applying the factors set forth in the testimony by the vocational rehabilitation expert, Theriot estimated that if Grayson were only able to earn minimum wage and participate in the labor market 75% of the time, his total loss of earnings would be $582,000.00.[6]
Given this testimony and based upon our review of the record as a whole, we likewise find no abuse of discretion in the jury decision to award $275,000.00 for plaintiff's loss of future earning capacity. On review, we find the record amply supports the award.

*23 Future Medical and Rehabilitative Expenses

Future medical expenses must be established with some degree of certainty. However, an award for future medical expenses is by nature somewhat speculative. Martino, 619 So.2d at 91. In the instant case, Grayson was awarded $25,000.00 for future medical and rehabilitative expenses.
In addition to the testimony contained in the record establishing the need for and cost of future psychotherapy and medication, the record includes testimony indicating that Grayson will require extensive future vocational rehabilitation services. Considering that the cost of these services alone would exceed the amount awarded by the jury herein, we find no abuse of discretion in the jury's award. On review, we find the record supports the award, and we find no basis to upset the amount awarded.

Loss of Consortium
Finally, turning to the $50,000.00 loss of consortium award to Mrs. Grayson, we likewise find no abuse of the jury's discretion in either the making of or the amount of this award. Loss of consortium includes such pecuniary elements as loss of services and such non-pecuniary components as love, companionship, affection, society, sexual relations, comfort and solace. Daigle v. Legendre, 619 So.2d 836, 842 (La.App. 1st Cir.), writ denied. 625 So.2d 1040 (La.1993).
Mrs. Grayson testified at length and in detail about the effect of Mr. Grayson's injuries on the couple's twenty-eight year marriage and family life. As discussed above, Mr. Grayson's frustration and anxiety has significantly changed the relationship between him and his wife. He has become reclusive and uncommunicative, no longer wants to talk to her and does not even eat his meals with the family. Additionally, he is no longer able to help her with the chores he used to perform and has been unable to actively participate in the rearing of their youngest child, who was only thirteen months old at the time of the accident.
While Mrs. Grayson's devotion to her husband has remained unchanged, clearly, the relationship she shared with him has been drastically altered. On review, considering the record herein, we are unable to say that the jury abused its discretion in this award.
This assignment of error also lacks merit.

CONCLUSION
For the above and foregoing reasons, the judgment on appeal herein is affirmed in its entirety. Costs of this appeal are assessed one-half to R. B. Ammon & Associates, Inc. and Commercial Union Insurance Company, and one-half to CBC Temporary Staffing Services, Inc. and GAN Insurance Company.
AFFIRMED.
NOTES
[1] Judge Michael G. Bagneris of the Civil District Court for Orleans Parish is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] For ease of discussion, we address all of the assignments of error alleged, although not necessarily in the order enumerated by the parties.
[3] At the time of Grayson's accident in 1995, Comeaux was about twenty-one years old.
[4] Accordingly, we pretermit discussion of plaintiffs' first assignment of error, in which they argue that, the trial court erred in failing to enforce an alleged judicial admission by these defendants as to the applicability of Morgan. In a motion for summary judgment, defendants had contended that Morgan, as decided by the court of appeal, was directly on point. However, after the court of appeal decision was reversed by the Supreme Court, these defendants asserted that the facts of this case are distinguishable from the factual situation in Morgan.
[5] We note that LSA-R.S. 23:1104 was added in 1996 to provide that in a suit by an employee against a third person, the fault of the employer shall be assessed, and any fault so assessed shall not be reallocated to any other person or party. The statute further provides that in such a suit against a third party, any recovery by the employer for compensation benefits paid shall be reduced by the fault assessed to the employer. However, this provision is clearly substantive, and we decline to give it retroactive effect.
[6] This figure apparently included Theriot's calculation of past lost earnings of $84,000.00.