840 So.2d 597 (2003)
TOWN OF HAYNESVILLE, INC., Plaintiff-Appellee,
v.
ENTERGY CORPORATION and Entergy Louisiana, Inc., Defendants-Appellants.
No. 36,519-CA.
Court of Appeal of Louisiana, Second Circuit.
January 31, 2003.
*598 Michael Lee Dubos, for Appellants.
James Henry Colvin, for Appellee.
Before GASKINS, DREW and HARRISON (Pro Tempore), JJ.
DREW, J.
In a dispute over the amount the utility company owed to the Town of Haynesville pursuant to a franchise agreement, Entergy Louisiana, Inc. (ELI, formerly Louisiana Power and Light or LPL) and Entergy Corporation[1] appealed the summary judgment in favor of the Town of Haynesville. Also before this court is the denial of ELI and Entergy's motion for summary judgment. The trial court designated the December 27, 2001, judgment as a "final judgment" under La. C.C.P. art. 1915(B)(1), further declaring there was no just reason for delaying the appeal, since the ruling adjudicated one of the plaintiff's theories of recovery. For the following reasons, the judgment is affirmed.

PROCEDURAL BACKGROUND

Haynesville's Petition for Damages
In June 2000 the Town of Haynesville sued Entergy Louisiana, Inc. (ELI) and Entergy Corporation seeking damages for higher franchise fees under a "most favored nation" provision of the town's contract with the utility provider. The town alleged in its petition:
 The town entered into an irrevocable franchise agreement with Louisiana Power and Light (LPL) on January 15, 1985, for a term of 25 years until January 15, 2010. (LPL became ELI in 1996 and, for simplicity, will be referred to as ELI.)
The franchise permitted ELI to sell electricity to Haynesville, for which the town was to receive 2% of the *599 gross revenues received by ELI from commercial and residential customers in Haynesville.
 The franchise agreement provided that should ELI enter into a franchise agreement with another municipality to pay more than 2%, then the payment to Haynesville would automatically increase to the higher percentage, a "most favored nation" clause (MFN).
 Entergy purchased LPL, changed LPL's name to ELI and became responsible under and bound by the terms of the franchise agreement.
 In 1995 Entergy purchased Gulf States Utilities (now EGS), which paid franchise fees of 5% or more and continues to do so.
 Despite amicable demand, ELI refused to pay Haynesville the increased percentage of gross proceeds pursuant to the "most favored nation" clause.
 Haynesville's claim against Entergy was that Entergy and its numerous affiliated companies, including EGS, act as a "single business enterprise" and/or "alter egos" of one another.
 Entergy, EGS and ELI share common directors, officers, employees, co-mingled funds, centralized accounting, common offices, unified administrative control and other conduct.
 Entergy holds itself out as a single business enterprise.
 The seven (at least) separate entities, including Entergy, ELI and EGS, are a legal fiction. Therefore, the "most favored nation" clause has been triggered by EGS's payment of 5% franchise fees.
 Alternatively, if the separateness of the entities is maintained, then ELI is paying other towns in excess of 2% franchise fees; therefore, ELI owes Haynesville those larger percentages from the time they commenced the larger payments.

ELI/Entergy's Answer
ELI's and Entergy's answer was filed August 1, 2000. Attached thereto was a June 21, 1999, letter from Entergy to the Town of Haynesville which stated:
 Entergy paid Harahan and Kenner more than 2% but the excess was passed on to the customers through a line item added to their bill. Haynesville was offered and declined the same opportunity.
 According to ELI, a general order of the Public Service Commission required ELI to include the part of the fee over 2% as a line item on the customers' bills.[2]
 Haynesville had not decided whether to adopt the higher franchise fee in the future.
 The town's indecision caused the "damages" allegedly due from ELI to continue to accrue.
 Entergy sent a check for $10,080.52, which Entergy stated would cut off any future claims by Haynesville.
 The agreement imposed no obligation on ELI to pay any higher franchise amount paid by any other Entergy affiliate, such as Entergy Arkansas and EGS.

Haynesville's Motion for Summary Judgment
Haynesville filed a Motion for Summary Judgment (MSJ) on July 11, 2001, and *600 urged that ELI's 1989 franchise agreement with West Monroe triggered the "most favored nation" clause in favor of Haynesville. In the memo supporting its MSJ, Haynesville noted that the 5% franchise fees paid by EGS were not at issue in its MSJ. Moreover, Haynesville observed that at the time the suit was filed, Haynesville was relying upon the 2½% franchise fees paid to Kenner and Harahan. Only during discovery did Haynesville learn of the 3% plus $180,000 franchise fee paid to West Monroe beginning in 1989. Haynesville demanded the same 3% and fixed franchise fees as paid to West Monroe since 1989.
In addition to the Haynesville contract, MFN letter, Haynesville ordinances and minutes of the town council concerning the franchise agreement, Haynesville supported its MSJ with the depositions of Norman Colvin, an ELI representative, and John Grantham, retired ELI district manager of the West Monroe district. Haynesville also supplied ELI's responses to its requests for production and affidavits from an economist which projected Haynesville's damages.
According to Haynesville, the 3% payments along with the nine payments of $20,000 each to West Monroe beginning in 1989 replaced the free and discounted services under the 1966 franchise agreement and were a "franchise fee" under the 1989 ELI franchise agreement with West Monroe. By virtue of its MFN clause, Haynesville contended it should have begun receiving 3% of its gross revenues plus $180,000 beginning January 1, 1989.

ELI/Entergy's Motion for Summary Judgment
ELI/Entergy sought a summary judgment dismissing Haynesville's claim for an additional 1% franchise fee plus $180,000 based upon ELI's 1989 agreement with West Monroe. Further, Entergy sought a summary judgment dismissing Haynesville's action for an increased franchise fee based upon any franchise agreement by EGS under the "single business entity" theory. ELI/Entergy's MSJ was negative; i.e., that Haynesville was not entitled to recover under either theory.
Concerning Haynesville's claim based upon the West Monroe franchise, the defendants stated that on May 30, 1925, ELI entered into a contract to provide West Monroe electricity and to purchase the town's light and power facilities. The contract was amended and supplemented in February 1929. According to ELI/Entergy:
 The free and discounted electrical service began under the 1925 and 1929 agreements and was compensation for the purchase price and the electrical franchise.
 The contract provided that those provisions were to be carried over as long as ELI supplied electricity to West Monroe.
 In 1988, ELI began negotiations to extend the 1966 contract expiring in 1991.
 To avoid continuing free and discounted electrical service under non-standard rate schedules and to terminate ELI's obligations under the 1925 and 1929 contracts, ELI sought to convert West Monroe to a standard franchise agreement with a 2% standard fee and to enter a settlement terminating the 1925 and 1929 contracts by paying an additional 1% fee.
 Calculations showed that with the 2% franchise fee and the 1% payment, West Monroe would have a shortfall of $74,000 annually from 1989 until the 1991 expiration date based upon the value of the previously-received free and discounted services.

*601  To compensate West Monroe for entering into the new contract prior to the 1991 expiration of the contract for free and discounted services, ELI agreed to pay West Monroe $20,000 a quarter through the first quarter of 1991, a total of $180,000.
 The West Monroe city council on December 13, 1988, passed ordinances and voted authority to the mayor to enter a 25-year franchise agreement with ELI for 2%.
 In a separate ordinance, the West Monroe city council, for an additional 1% and the quarterly payments, agreed to terminate ELI's obligations under the 1925 and 1929 agreements.
Taking the position that the 2% franchise fee is completely separate from the settlement of the prior contractual obligations, ELI/Entergy argued that Haynesville's claim that ELI pays West Monroe a 3% franchise fee is unfounded. In other words, the defendants urged that the 1% and $180,000 payments were not franchise fees but settlement of a dispute over whether the utility company had to supply West Monroe with free and discounted electricity. Based on the foregoing, ELI/Entergy urged that Haynesville's motion for summary judgment was erroneously granted, and ELI/Entergy's motion for summary judgment incorrectly denied.
ELI/Entergy also urged there was no legal authority for binding ELI/Entergy based upon the franchise agreements of EGS which was not acquired by Entergy for a number of years after the Haynesville MFN agreement was reached with ELI. Therefore, ELI/Entergy sought to have summary judgment granted on this issue also.
ELI/Entergy supported its MSJ with the Haynesville MFN letter from ELI, the 1925 contract between the utility and West Monroe along with the 1925 West Monroe ordinance and a 1929 amendment to the 1925 contract. ELI/Entergy also supplied the same deposition of John Grantham, a 1988 ELI letter seeking a renewal of the 1966 West Monroe contract, the 1988 West Monroe ordinances, contract and agreement with ELI, 1984 Haynesville town council minutes along with a letter from the town attorney concerning the MFN clause, the Kenner and Harahan agreements, the deposition of Haynesville's mayor, and a 1985 organizational chart of Mid South Utilities, Inc. (later, Entergy, Inc.).

Trial Court Action
A hearing was conducted on August 16, 2001. On August 29, 2001, the trial court signed a judgment granting Haynesville's MSJ and denying ELI/Entergy's MSJ. On September 19, 2001, ELI/Entergy also filed an exception of prescription and a motion for reconsideration of quantum figures supplied by Haynesville in support of its MSJ.
The trial court conducted a hearing on November 12, 2001, at which ELI/Entergy's motion for reconsideration and exception of prescription were heard. The parties signed and filed stipulations stating:
1. Prior to the commencement of the instant litigation, Entergy Louisiana, Inc., through its duly authorized representatives, advised the Town of Haynesville, Inc., that the only municipalities to which it pays a franchise fee in excess of its standard 2% are Kenner and Harahan.
2. Kenner and Harahan receive franchise fees in excess of the standard 2% (up to a maximum overall of 2.5%); however, the amount so received over the standard 2% is reflected as a line item on the customer bills for the residential and *602 commercial customers of Kenner and Harahan.
3. No representative of Entergy Louisiana, Inc. has advised the Town of Haynesville that the City of West Monroe receives a franchise fee in excess of the standard 2% franchise fee, it being the position of Entergy Louisiana, Inc. that the City of West Monroe received the standard 2% franchise fee and that the 1% payment and the nine (9) $20,000 quarterly payments were not and are not franchise fees.
4. Entergy Louisiana, Inc. entered into the Kenner franchise agreement on or about February 5, 1996.
5. Entergy Louisiana, Inc. entered into the Harahan franchise agreement on or about April 18, 1996.
6. Entergy Corporation acquired Gulf States Utilities Company on or about December 31, 1993.
7. The Town of Haynesville has not voted to accept an increased franchise fee if the amount over the standard 2% would be included as a line item on the customer bill.
8. The present action by the Town of Haynesville, Inc., does not seek prospective relief at this time.
On November 30, 2001, the trial court entered reasons for judgment which delineated two issues for decision: (1) In Haynesville's MSJ, did ELI's West Monroe franchise agreement effective January 1, 1989, trigger Haynesville's MFN clause? (2) In ELI/Entergy's MSJ, in addition to the foregoing issue, did ELI establish that Haynesville was not entitled to recover under the "single business entity" theory because other Entergy companies were paying more than 2% franchise fees? Finding that Haynesville had established there was no genuine issue of material fact, the trial court granted Haynesville's MSJ. The trial court found genuine issues of material fact as to the energy defendants' MSJ, which was denied.
The final judgment signed on December 27, 2001, granted Haynesville's MSJ based upon ELI's franchise agreement with West Monroe. The trial court granted the defendants' motion for reconsideration of quantum calculations and awarded Haynesville $629,458.75 "plus legal interest to accrue on the principal balance due of $364,763.38 from August 16, 2001, until paid." In all other respects, ELI/Entergy's motion to reconsider the summary judgment previously granted in favor of Haynesville was denied. The trial court also overruled ELI/Entergy's exception of prescription. Further, the order denied ELI/Entergy's MSJ seeking rejection of Haynesville's action (1) based upon the West Monroe franchise agreement and (2) under 5% franchise fees paid by EGS under the "single business entity" theory.
Thereafter, ELI/Entergy filed a supervisory writ seeking review of the denial of its MSJ on both grounds. In denying the writ as moot (No. 36,484-CW), this court noted that the appeal of the partial summary judgment designated as final for purposes of immediate appeal brought with it for review the related interlocutory orders of the trial court. ELI/Entergy suspensively appealed the December 27, 2001, judgment. In its argument and briefs on appeal, ELI/Entergy made no complaint about the prescription ruling and neither side objected to the quantum award.

DISCUSSION
Appellate review of the grant or denial of a motion for summary judgment is de novo. Green v. State Farm General Ins. Co., 35775 (La.App.2d Cir.4/23/2002), 835 So.2d 2. La. C.C.P. art. 966 provides that the plaintiff or defendant may move for a *603 summary judgment in its favor for all or part of the relief for which it has prayed. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of an action. The procedure is favored and the trial court should construe it to accomplish the stated goals. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966.
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require it to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial, there is no genuine issue of material fact. A summary judgment can dispose of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case. La. C.C.P. art. 966.
In Merlin B. Smith, Inc. v. Travelers Property Cas., 35695 (La.App.2d Cir.2/27/02), 811 So.2d 1097, this court explained that the likelihood that a party will be unable to prove his allegations at trial does not constitute a basis for rendering summary judgment. The function of the court on summary judgment is not to determine the merits of the issues involved, but only whether or not there is a genuine and material factual issue. Merlin B. Smith, Inc., supra.

Summary Judgment in Favor of Haynesville Based upon West Monroe Contract
On appeal, the defendants maintained the 1% and $180,000 were not franchise fees but settlement of any dispute arising from the earlier contracts with West Monroe to provide free and discounted services. Haynesville's position was that ELI's agreement to pay West Monroe 3% plus $180,000 in franchise fees triggered Haynesville's MFN clause.
Included in the filings in support of its MSJ, Haynesville filed the deposition of John Grantham, retired LPL district manager of the West Monroe district. Both Haynesville and ELI/Entergy referred to Grantham's statements to support their positions. According to Grantham:
 When the utility sought to renew the 1966 agreement with West Monroe, ELI wished to discontinue the impractical free and discounted services, a practice begun in the 1920's when the company acquired the electrical facilities and the West Monroe franchise.
 Provision of free and discounted services had been carried forward in subsequent agreements including the 1966 contract which was to expire in 1991.
 The free and discounted services were not desirable to ELI because the utility had to perform complex and burdensome calculations and were non-standard rates.
 ELI had to come up with something to make up the difference between the value of what West Monroe was getting under the 1966 agreement and what the city would receive under the 1989 renewal agreement.

*604  ELI was still paying for facilities bought in 1925.
 Grantham acknowledged that the 2% was to get the city on a standard rate and the 1% was to make the city whole and induce it to give up the free and discounted services.
Specifically, the defendants maintained that the 1989 agreement negotiated in 1988 with West Monroe was embodied in West Monroe Ordinance No. 2268, which authorized the 25-year franchise, and West Monroe Ordinance No. 2269, which authorized the standard 2% franchise fee and the Municipal Contract. ELI/Entergy relied upon the separate contract and ordinance, No. 2271, the stated consideration for which was the termination of any obligation on ELI to continue the free and discounted services found in "all previous Franchises and related Agreements" along with the resolution and termination of any claims arising out of "any and all previous Franchises and related Agreements" for free electricity or electricity billed under non-standard rates. In the defendants' view, the foregoing language was not limited to the renewal of the 1966 franchise agreement but covered all other agreements.
The trial court rejected ELI's argument that the 1% plus $180,000 (above the standard 2% of gross revenues) was paid to West Monroe in settlement of claims because one document provided for the standard 2% while another separate written document provided for the additional 1%. Specifically, the trial court found that the 2%, the 1% and the payment of $180,000 were all franchise fees for the right to supply electricity to the City of West Monroe. After reviewing all the documents, the trial court noted that the 1966 agreement (Ordinance 1355) stated that ELI agreed to provide enumerated free and discounted services as consideration for the franchise rights. Moreover, Ordinance 2271 of 1988 stated that in the 1966 ordinance, the consideration for franchise rights was free and discounted electricity. The 1966 ordinance did not mention the 1925 agreement. The trial court concluded that the free and discounted services from 1966 through 1988 were given solely as consideration for the franchise fees. In order to cease providing free and discounted services, ELI apparently calculated that 3% franchise fees were necessary to replace the value of the free and discounted services paid under the 1966 agreement for franchise rights. The $180,000 payment was to compensate West Monroe for entering into the new franchise agreement on January 1, 1989 instead of the 1991 expiration of the 1966 agreement. While ELI/Entergy characterizes the 1% plus $180,000 as settlement of its obligation to provide free and discounted services, the free and discounted services were, in fact, payment of franchise fees to West Monroe.
The documents in the record belied ELI/Entergy's contention that the 1% payment over the course of the 25-year franchise and $180,000 payment were continued compensation for property sold to the utility in 1925. In 1925, the West Monroe system served only 844 customers. Moreover, the 1925 contract stated the company provided West Monroe electrical service as the purchase price for the equipment and as consideration for franchise rights. The 1925 contract required that, if the town declined to renew the franchise at the end of the 25-year term, then West Monroe was to purchase all of the utility lines and property owned by the utility at the current appraised value. If during the term of the 25-year agreement, the utility chose to sell the lines, wires and other property, the utility was required to give West Monroe the right of first refusal. *605 As the trial court observed, ELI made no showing to the court that West Monroe, at the time of the renegotiation, still had any ownership in the property transferred in the 1925 agreement. Clearly, the utility long ago bought and paid for the physical property purchased in the 1925 contract, which stated the utility bought the utility equipment in "full and complete ownership." The trial court did not err in finding the 3% and the $180,000 to be franchise fees, not payments for 1925 assets.
Next, ELI/Entergy pointed out that Ordinance No. 2271 was enacted after the West Monroe city council had already passed Ordinance Nos. 2268 and 2269 related to the term and the 2% franchise fee. We find the sequence in which West Monroe enacted its ordinances to be a somewhat misleading argument. All of the West Monroe ordinances were passed on December 13, 1988, and are an integral part of the franchise arrangement.
ELI/Entergy's argument is refuted by the deposition of Norman Colvin, a ELI representative, who explained that agreements aside from the standard 2% were typically placed in other documents. According to Colvin, all municipalities signed the same 2% municipal contract form that had been in use for 30 to 40 years. Concerning Haynesville, Colvin stated the MFN letter was part of the consideration for Haynesville granting ELI the right to supply the town's electricity. Colvin explained that the MFN clause was separate from the franchise agreement because ELI was very particular about not changing its standard 2% franchise agreement form. In the 25-year franchise agreement signed January 15, 1985, ELI agreed to pay Haynesville 2%. To protect the town, the town council sought a MFN clause which was granted in the letter to the Haynesville Mayor and Town Council signed January 8, 1985, by D.E. Knowles, another ELI official. At the deposition of Christopher Screen of ELI Services, counsel for ELI/Entergy and Haynesville stipulated that the MFN letter constituted part of the Haynesville franchise agreement. By the same token, the various documents enacted by ELI and West Monroe in 1988 are all part of the franchise agreement.
Moreover, the defendants relied upon a 1985 cover letter from Haynesville's town attorney transmitting the MFN letter to the council. The attorney stated that the MFN clause was limited to the 2% franchise fee and "would not cover any other agreements [ELI] may make with any other municipality." ELI/Entergy contended that letter was an acknowledgment by Haynesville that ELI had the full right and authority to contract with any other town to pay additional fees other than franchise fees without implicating the MFN clause. What the Haynesville MFN clause specifically required was that ELI pay Haynesville the equivalent of any franchise fees above 2% should ELI pay more than 2% to another municipality. In this case, the 1988 agreement reached between ELI and West Monroe was for payment of franchise fees in excess of 2%.
Our de novo review of the material filed in support of and in opposition to Haynesville's MSJ based on ELI's franchise agreement with West Monroe shows that the trial court did not err in finding no genuine issue of material fact and in granting Haynesville's summary judgment predicated upon ELI's West Monroe contract.
Denial of ELI/Entergy's MSJ That Haynesville Was Not Entitled to Recover Under Haynesville's "Single Business Entity" Theory
In seeking a summary judgment that Haynesville was not entitled to recover under the "single business entity" theory, ELI/Entergy stated that Entergy was *606 a publicly-traded utility holding company of which ELI and EGS were wholly-owned subsidiaries. At the time the 1985 MFN agreement was made with Haynesville, EGS was a separate and distinct corporation from ELI. EGS was not acquired by Entergy until 1993. In addition to supplying documents establishing that Mike Ruddick, the town attorney, was authorized by the Haynesville town council to obtain the MFN agreement, ELI/Entergy relied on the fact that the MFN letter stated the MFN clause was triggered only if ELI (not other entities) agreed to pay another municipality more than 2% in franchise fees. The utility defendants vigorously disputed Haynesville's assertions that Entergy and its subsidiaries formed a "single business entity." Noting that a corporation's separate status is disregarded only in exceptional circumstances, ELI/Entergy challenged Haynesville to produce legal authority to support this portion of its action.
In opposing ELI/Entergy's MSJ, Haynesville acknowledged that the "single business entity" issue is res nova, that ELI was acquired by Entergy's predecessor in 1949, that Haynesville's MFN agreement was made in 1985, and that Entergy did not acquire EGS until 1993. Haynesville supported its opposition with the deposition of Christopher Screen, an Entergy Services, Inc., employee who stated that Entergy owned 100% of the stock of ELI and EGS which shared common offices and directors. Via deposition, Nathan Langston, Chief Accounting Officer for Entergy, Entergy Services, Inc., ELI and EGS, explained that Entergy Services was the service company for various Entergy-owned companies including ELI and EGS. Entergy Services paid franchise fees to municipalities for both ELI and EGS. Each company had separate payrolls, federal tax ID numbers and separate filings with the federal government for withholding. As further support of its opposition to the utilities' MSJ, Haynesville submitted copies of 1999 through 2001 checks issued by Entergy Services to West Monroe, all stubbed "franchise tax."
In addition, Haynesville supplied a newspaper advertisement which ran May 9, 1996, in the Homer, Louisiana, newspaper stating that LPL was now Entergy which had unified "five separate power companies into one cohesive whole." The advertisement extolled various advantages to the citizens by having one "world class energy company" supply its electricity. After stating that Entergy was putting 12,000 employees and 80 years of experience to work for the customers, the ad concluded with "One company. One name. And one commitment to serve you like no other company can. Entergy."
Citing Green v. Champion Ins. Co., 577 So.2d 249 (La.App. 1st Cir.1991), writ denied, 580 So.2d 668 (La.1991), the trial court noted the courts may disregard the concept of corporate separateness to extend liability to affiliated corporations to achieve equity. The Green court stated that whether an affiliated group of entities is a "single business enterprise" is a question of fact. In determining whether a corporation is an "alter ego" or part of a "single business entity," the court must look at the substance of the corporation rather than the form. The Green court supplied a non-exclusive list of considerations similar to those used to "pierce the corporate veil."[3]
*607 Neither Haynesville nor the defendants presented authority for liability under the "single business theory" under the facts of this case. Nor did ELI/Entergy establish that it was legally entitled to summary judgment denying Haynesville relief under the "single business entity" hypothesis. We agree with the trial court's conclusion that there are genuine issues of material fact as to whether Entergy operated as a "single business entity." The trial court properly denied ELI/Entergy's request for summary judgment on this issue.

CONCLUSION
The bottom line is that West Monroe historically had a great deal for free and discounted services. This advantageous arrangement negotiated by the leaders of West Monroe was burdensome for the utility. In order to entice the city fathers of West Monroe to depart from the long-standing and favorable arrangement, the utility calculated the monetary value of the free and discounted services provided to the city. The standard 2% franchise fee was insufficient to insure that the city continued to receive the same rate of benefit from the utility franchise. Therefore, the utility and the city agreed to the additional 1% over the 25-year term of the franchise plus the $180,000 payments to compensate the city for value it lost by renewing the contract in 1989 instead of at its expiration in 1991. ELI's 1989 franchise agreement to pay West Monroe 3% plus $180,000 in franchise fees triggered the 1985 MFN clause in Haynesville's franchise agreement. A deal is a deal.
Based upon our de novo review of the pleadings, depositions, documents, answers to interrogatories, and admissions on file, together with the affidavits filed, the trial court did not err in granting the Town of Haynesville's MSJ based upon the West Monroe franchise agreement and in denying the defendants' MSJ on the West Monroe issue and the "single business entity" issue.
The judgment of the trial court is affirmed at the defendants' costs. The matter is remanded for further proceedings.[4]
AFFIRMED AND REMANDED.
NOTES
[1] Entergy Corporation is the parent company of ELI, Entergy Gulf States Utilities (EGS) and other utility suppliers.
[2] The PSC General Order dated October 18, 1988, orders "... that all jurisdictional public utility companies including but not limited to electric ... providers, shall describe each charge that is unrelated to a tariff for that service to their customers. These charges shall appear as a line item on each customer bill...."
[3] The illustrative list are considerations of whether a group of entities constitute a "single business enterprise":

1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; 2. common directors or officers; 3. unified administrative control of corporations whose business functions are similar or supplementary; 4. directors and officers of one corporation act independently in the interest of that corporation; 5. corporation financing another corporation; 6. inadequate capitalization ("thin incorporation"); 7. corporation causing the incorporation of another affiliated corporation; 8. corporation paying the salaries and other expenses or losses of another corporation; 9. receiving no business other than that given to it by its affiliated corporations; 10. corporation using the property of another corporation as its own; 11. noncompliance with corporate formalities; 12. common employees; 13. services rendered by the employees of one corporation on behalf of another corporation; 14. common offices; 15. centralized accounting; 16. undocumented transfers of funds between corporations; 17. unclear allocation of profits and losses between corporations; and 18. excessive fragmentation of a single enterprise into separate corporations. Green, supra at pp. 257-258.
[4] To avoid further piecemeal litigation and waste of judicial resources, the parties should resolve all outstanding issues prior to seeking further appellate review.