BONA FIDE DEMOLITION AND
RECOVERY, LLC

v.

CROSBY CONSTRUCTION COMPANY OF LOUISIANA, INC., Crosby Construction, LLC, Crosby Enterprises, LLC, V. Crosby Construction, LLC, Stephen Barbuto, Lavernie Crosby, Jr., Thomas Karam, Capes Investment, LLC, John E. Seago, Seago & Carmichael, APLC, Anthony Barbuto, Weathertight Roofing, Inc., Baltimore Industries, Inc.

Civil Action No. 07–3115.

United States District Court,
E.D. Louisiana.

Feb. 1, 2010.

Serena E. Pollack, Jeffrey M. Hoffman, Michael Richard Allweiss, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA, for Bona Fide Demolition and Recovery, LLC.

Thomas Karam, Elkridge, MD, pro se.

Capes Investment, LLC, Elkridge, MD, pro se.

Charles E. Hamilton, III, Galen S. Brown, Hamilton Brown & Babst, Patrick Hannon Patrick, Pierre V. Miller, II, Patrick Miller Law Firm, New Orleans, LA, Paul H. Spaht, Travis Brendon Wilkinson, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA, David Scranton Daly, Allen & Gooch, Metairie, LA, for Defendants.

### *ORDER AND REASONS*

SARAH S. VANCE, District Judge.

Before the Court are four motions to dismiss submitted by defendants Balti-

more Industries ("BI") and Capes Investment, LLC ("Capes"). (R. Doc. 318, 353, 354, and 367). BI and Capes seek dismissal of all claims filed against them by plaintiff Bona Fide Demolition and Recovery, LLC ("Bona Fide"), and co-defendants and cross-claimants Stephen Barbuto, Anthony Barbuto and Weathertight Roofing, Inc ("Weathertight"). (R. Doc. 318, 353, 354, 367). The motions allege (1) that this Court lacks personal jurisdiction over BI and Capes, and (2) that Bona Fide, Anthony Barbuto, Stephen Barbuto, and Weathertight, collectively "claimants," have not stated a cognizable claim for relief against BI or Capes under Federal Rule of Civil Procedure 12(b)(6). (R. Doc. 318, 353, 354, 367). For the following reasons, the Court GRANTS Capes's motions and DENIES BI's motions.

## I. BACKGROUND

### A. Factual Background

#### 1. The Alleged Fraudulent Scheme

This suit arises out of a failed business relationship between plaintiff Bona Fide and defendants Crosby Construction Company of Louisiana, Inc. ("CCCL"), Crosby Construction, LLC ("CC"), Crosby Enterprises, LLC ("CE"), V. Crosby Construction, LLC ("VCC"), V. Crosby Company, LLC ("VC"), and Crosby Development Enterprises, LLC ("CDE"), collectively referred to herein as the "Crosby Companies". Capes, BI, Seago & Carmichael APLC ("S & C"), Weathertight, and Continental Casualty Company ("Continental") are also named as defendants in this suit. In addition, the following individuals are named defendants: Lavernie Crosby, Jr. ("Crosby"), Thomas Karam ("Karam"), John E. Seago ("Seago"), Stephen Barbuto and Anthony Barbuto. (R. Doc. 228). Stephen Barbuto, Anthony Barbuto, and Weathertight have also filed separate cross-claims against the Crosby Companies, BI, Capes, Crosby, Karam, Seago, Seago & Carmichael, and Continental. (R. Doc. 332, 331, and 365).

Claimants allege that BI and Capes were part of a fraudulent scheme to induce claimants to form joint business ventures with the Crosby Companies in which each invested money under false pretenses. (R. Doc. 228, 331, 332, and 365). On November 21, 2006, representatives from Bona Fide, a demolition company based in Colorado, met with Crosby and Seago, Crosby's legal counsel, in Greenwood Village, Colorado. There, Crosby and Seago discussed with Bona Fide representatives the potential to go into business together. Crosby and Seago represented that the Crosby Companies were minority owned, and thus uniquely positioned to receive government demolition contracts earmarked for minority owned businesses following Hurricane Katrina. Moreover, Crosby and Seago further represented that the Crosby Companies had already received a number of government earmarked contracts, but were seeking to partner with Bona Fide because the Crosby Companies did not possess the equipment or personnel needed to actually perform the work at that time. To help substantiate these claims, Karam, who did not physically attend the Colorado meeting, had prepared certain marketing materials that Crosby and Seago presented to Bona Fide. The materials included a syllabus, which described the various Crosby Companies, company overviews, and summaries of each of the Crosby Companies' functional capabilities. Karam also prepared financial spreadsheets for Bona Fide's use, which included information about the Crosby Companies' revenues, including the government contracts the Crosby Companies had allegedly obtained. In the weeks after the Colorado meeting, the parties discussed

many aspects of the proposed deal. During this time, Karam communicated with Bona Fide representatives via email and phone from a Maryland office location. The Maryland office location functioned as the offices for BI, Capes, and the Crosby Companies.

Bona Fide agreed to form a joint venture with Crosby and the Crosby Companies. Before Bona Fide transferred any money, Crosby and Seago outlined how Bona Fide's invested money would be spent and reassured Bona Fide that New Orleans operations could start soon. Specifically, Crosby and Seago assured Bona Fide that they could set up offices in New Orleans and hire licensed and experienced subcontractors capable of completing any demolition contract the joint venture received. With these representations in mind, Bona Fide wired the initial capital for the business, as per Karam's instructions. Bona Fide did so by (1) lending Crosby $20,000 as an advance, which Crosby personally guaranteed; (2) signing a Letter of Intent with Crosby to enter into a joint business enterprise; (3) lending $105,000 to both CCCL and CC, which CE and Crosby guaranteed; and (4) paying CCCL $75,000 not to "have further contact or communication with other potential investors." (R. Doc. 228, Ex. B, C, and D). Bona Fide completed the last of the transactions on December 5, 2006.

After the initial financing was complete, Bona Fide sent several representatives to New Orleans. There, Seago, Crosby, and Karam again told Bona Fide that the Crosby Companies had functional offices, licensed staff, and pre-existing government contracts. Thus assured, Bona Fide moved both its equipment and personnel to New Orleans. When Bona Fide arrived, however, Bona Fide found no functional offices; the Crosby Companies did not employ licensed and credentialed staff; and

the Crosby Companies did not have government contracts. Consequently, Bona Fide leased office space and established operations for the joint business enterprise on its own.

In addition, Bona Fide learned after moving to New Orleans that Crosby was actively seeking additional investors in contravention of the nonsolicitation agreement the parties had agreed upon in Colorado. One such investor was Stephen Barbuto, whom Crosby allegedly approached as a potential business partner in the fall of 2006. Seago, Karam, and Crosby represented to Stephen Barbuto that Crosby was seeking partners/investors for the Crosby Companies. After negotiations, Stephen Barbuto and Crosby agreed to form a partnership effective January 1, 2007. According to Barbuto, as a result of the partnership, he was to own 49% of any entity Crosby owned. To consummate the deal, Stephen Barbuto opened various bank accounts, as per Karam's instructions, and with the aid of his son Anthony Barbuto, wired money from New Jersey and Florida to various Crosby Companies. Further, in early January 2007, Stephen Barbuto and Anthony Barbuto allegedly leased over $3,000,000 in equipment to be used by Crosby to perform demolition work in the New Orleans area. Weathertight, a New Jersey company owned by Stephen Barbuto, also agreed to fund up to $5,000,000 in future advances to CC. Allegedly, Crosby and Karam transferred funds advanced by Weathertight to BI, Capes, or Crosby Companies not party to the Barbuto–Crosby partnership for their own personal use.

In January 2007, the alleged scheme began to unravel. Bona Fide learned that the Crosby Companies did not have the appropriate licenses to conduct demolition work in the State of Louisiana. As a result, the Crosby Companies could not

legitimately receive government contracts. After this discovery, Bona Fide met with Crosby and Seago to discuss the return of its invested money. Bona Fide did not receive any of its investment back. In February 2007, Bona Fide broke its lease for housing and office space and moved its personnel and equipment back to Colorado.

Crosby allegedly breached his agreements with Stephen Barbuto as well. For example, Stephen Barbuto alleges that Crosby failed to make payments for the equipment that he and his son Anthony leased. Like Bona Fide, the three cross-claimants demanded a return of their money. And, like Bona Fide, they have not received any of their investments back. The leased equipment has since been repossessed, and separate lawsuits have been filed against Stephen Barbuto to collect on the debts owed for the leased equipment.

## B. Procedural Background

Bona Fide initially filed this suit on June 4, 2007, alleging a general scheme to defraud by the named defendants. (R. Doc. 1). At that time Bona Fide named Crosby, Barbuto, and the Crosby Companies as defendants. *Id.* The complaint did not name BI or Capes. (R. Doc. 1). On February 20, 2009, this Court dismissed Bona Fide's complaint without prejudice because the Court lacked subject matter jurisdiction over the case as plaintiffs had pleaded it. (R. Doc. 199 and 202). Bona Fide moved the Court to reconsider. (R. Doc. 203).

Upon reconsideration, the Court granted Bona Fide time to amend its complaint to establish jurisdiction. (R. Doc. 219). On April 28, 2009, Bona Fide did so by filing a Second Amended Complaint. (R. Doc. 220). Like the First Amended Complaint, the Second Amended Complaint did not name BI and Capes as defendants. (R. Doc. 220). After Bona Fide amended its complaint for a third time, BI and Capes were finally added. (R. Doc. 233). Stephen Barbuto, Anthony Barbuto, and Weathertight answered Bona Fide's Third Amended Complaint and filed cross-claims against the Crosby Companies, Crosby, and Karam. (R. Doc. 331, 332, and 365). While the three defendants each filed cross-claims against BI, only Weathertight asserts a claim against Capes. (R. Doc. 365).

BI and Capes now move the Court to dismiss all claims against them. (R. Doc. 318, 353, 354, 367). The two defendants argue that the Court lacks personal jurisdiction and that the claimants have not stated a cognizable claim against them. *Id.*

## II. PERSONAL JURISDICTION

### A. Legal Standard

When a nonresident defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of showing that personal jurisdiction exists. *See Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir.1985). If the district court declines to hold a full evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdiction. *See Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir.1994). In making its determination without an evidentiary hearing, the court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir.1985). The allegations in the complaint must be taken as true unless controverted by affidavits, and all factual conflicts must be resolved in favor of the plaintiff. *See id.* "Eventually, of course, the plaintiff must establish jurisdiction by a preponderance

of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a *prima facie* showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1271 n. 12 (5 Cir.1983) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (cited in *Brown v. Flowers Industries, Inc.*, 688 F.2d 328, 333 (5th Cir. 1982))).

## B. "Minimum Contacts"

■ A court has personal jurisdiction over a nonresident defendant if: (1) the forum state's long-arm statute confers personal jurisdiction over that defendant; and (2) the exercise of jurisdiction complies with the Due Process Clause of the Fourteenth Amendment. *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir.1999). Because Louisiana's long-arm statute extends jurisdiction to the full limits of due process, *see* La.Rev.Stat. § 13:3201(B), a federal court sitting in Louisiana need determine only whether the exercise of its jurisdiction satisfies the requirements of constitutional due process.

■ The exercise of personal jurisdiction over a nonresident defendant satisfies due process when: (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state; and (2) the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Latshaw*, 167 F.3d at 211 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The defendant's connection with the forum state must be such that he "should reasonably anticipate being haled into court" there. *Latshaw*, 167 F.3d at 211 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S.

286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

■ Minimum contacts may give rise to either "specific" jurisdiction or "general" jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8–9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction exists when a plaintiff's cause of action arises from, or is related to, the nonresident defendant's minimum contacts in the forum state. *Id.* at 414 n. 8, 104 S.Ct. 1868; *Wilson*, 20 F.3d at 647. General jurisdiction exists if the defendant has engaged in "continuous and systematic" activities in the forum state. *Helicopteros*, 466 U.S. at 415, 104 S.Ct. 1868; *Wilson*, 20 F.3d at 647.

■ Courts presume the institutional independence of related corporations, such as a parent and its subsidiary, when they determine if one corporation's contacts with a forum can be the basis of jurisdiction over a related corporation. *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir.1999). It is established in the Fifth Circuit that when "a wholly owned subsidiary is operated as a distinct corporation, its contacts with the forum cannot be imputed to the parent." *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773–74 (5th Cir.1988); *see also Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir.1983) (finding that when parent and subsidiary maintain separate and distinct corporate entities, presence of one may not be attributed to the other). To fuse the two companies for jurisdictional purposes, there must be "proof of control by the parent over the internal business operations and affairs of the subsidiary." *Hargrave*, 710 F.2d at 1160. The theory is that because the two companies are the same entity, "the jurisdictional contacts of one are the jurisdictional contacts of the other for the purposes of the Internation-

al Shoe due process analysis." *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5 Cir.2002) (citing *Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Mgmt., Inc.*, 519 F.2d 634, 637–38 (8th Cir.1975) (explaining that "if the corporation is [the individual defendant's] alter ego, its contacts are his and due process is satisfied")).

The parties do not dispute that BI and Capes are not subsidiaries of the Crosby Companies. (R. Doc. 351 and 384). Instead, the claimants argue that BI and Capes, though separate corporations in form, are *actually* part of a single business enterprise with the Crosby Companies. (R. Doc. 351 and 384). The four claimants therefore argue that the Court should disregard the corporate form separating BI and Capes from the Crosby Companies, and attribute the Crosby Companies' minimum contacts to BI and Capes. *Id.* Both BI and Capes argue that they are separate and independent entities and that neither has sufficient contacts with Louisiana on its own to justify the exercise of jurisdiction over it. (R. Doc. 318, 353, 354, 367).

## C. Single Business Enterprise Theory

 "Corporations function as distinct legal entities, separate from the individuals who own them, and their shareholders are not generally liable for the debts of the corporation." *Hollowell v. Orleans Regional Hosp. LLC*, 217 F.3d 379, 385 (5th Cir.2000) (citing *Riggins v. Dixie Shoring Co.*, 590 So.2d 1164, 1167 (La.1991)), reh'g or reh'g en banc denied, 232 F.3d 212 (5th Cir.2000). The limited liability provided to shareholders by the corporate form not only promotes business and industry, but also encourages investment in high-risk areas by insulating personal wealth from inherent business risks.

*See* LSA–R.S. 12:93(B); *Buckeye Cotton Oil Company v. Amrhein*, 168 La. 139, 121 So. 602 (1929) (stating economic rational for corporate limitation of liability). Courts may disregard the concept of corporate separateness, *i.e.* pierce the corporate veil, when a corporate entity is used to "defeat public convenience, justify wrong, protect fraud, or defend crime." *See Smith v. Cotton's Fleet Serv., Inc.*, 500 So.2d 759, 762 (La.1987). Likewise, when two or more corporations constitute a single business enterprise ("SBE"), a court may "disregard the concept of corporate separateness and extend liability to each of the affiliated corporations."[1] *Brown v. Auto. Cas. Ins. Co.*, 644 So.2d 723, 727 (La.Ct.App.1994); *see also In re: Ark–La–Tex Timber Co.*, 482 F.3d 319, 335 (5th Cir.2007) (citing Louisiana appellate court cases); *Gundle Lining Construction Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201 (5th Cir.1996) (discussing piercing the corporate veil between two affiliated companies in terms of "alter ego" theory). A SBE "occurs when a corporation is found to be the 'alter ego, agent, tool or instrumentality of another corporation.'" *Dishon v. M. Ponthie*, 918 So.2d 1132, 1135 (La.Ct.App.2005) (citing *Green v. Champion Insurance Co.*, 577 So.2d 249, 257 (La. Ct.App.1991)).

 SBE theory differs from traditional veil piercing in two respects. First, when jurisdiction is at issue, traditional veil piercing operates vertically to allow the Court to impute a corporation's contacts to its shareholders. *Patin*, 294 F.3d at 653. Although some courts use traditional veil piercing horizontally to fuse two affiliated corporations, *see e.g., Miller v. Entergy Services, Inc.*, 913 So.2d 143, 148 (La.App.Ct.2005) (citing *Green*, 577 So.2d

---

1. The SBE theory has not been adopted in certain states. *See, e.g., Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 387 N.J.Super. 160, 903 A.2d 475 (N.J.App.Ct.2006).

249, 257), *writ denied,* 580 So.2d 668 (La. 1991); *F.G. Bruschweiler (Antiques) Ltd. v. GBA Great British Antiques, LLC,* 860 So.2d 644, 651 (La.App.Ct.2003), SBE theory can be used to fuse either affiliated or unaffiliated corporations, but not to impute corporate jurisdictional contacts to shareholders. *See Grayson v. R.B. Ammon & Assocs., Inc.,* 778 So.2d 1 (La.Ct.App.2000), writs denied,782 So.2d 1026 (La.2001), 782 So.2d 1027 (La.2001); *Holly & Smith Architects, Inc. v. St. Helena Congregate Facility,* 872 So.2d 1147, 1156 (La.Ct.App. 2004). Second, at least under Louisiana law, the legal standard utilized in traditional veil piercing and SBE cases is different. Traditional veil piercing cases require consideration of four or five primary factors, and then an inquiry into the "totality of the circumstances." *Riggins,* 590 So.2d at 1168 (considering commingling of funds, adherence to corporate formalities, undercapitalization, failure to provide separate bank accounts, and holding of regular shareholder meetings). SBE theory, on the other hand, uses an eighteen-factor test, in which no factor is dispositive. The list of eighteen factors is non-exhaustive, and the Court must still consider the "totality of the circumstances" in each case. *See Green,* 577 So.2d at 251–53 (La.App. Ct.1991) (eighteen-factor test). The eighteen factors include whether one corporation has sufficient ownership interest in another to give it actual working control, whether common directors or officers exist, whether a unified administrative control apparatus is present, and whether the business functions of the companies are similar or supplementary. *In re New Orleans Train Car Leakage Fire Litigation,* 690 So.2d 255, 257 (La.App.Ct.1997) (citing *Green,* 577 So.2d at 251–53). Other factors include whether the directors of one corporation act independently in the interest of that corporation or instead in the interest of another corporation, whether one corporation finances or pays the salaries and expenses of another corporation, and whether one corporation is inadequately capitalized or receives no business other than that given to it by another corporation. *Id.* In addition, a court must also evaluate whether a corporation uses the property of another corporation as its own, complies with corporate formalities, or keeps common employees or offices with another corporation. *Id.* And lastly, a court may look at the financial transactions between companies to determine whether two companies that are separate in form are in fact a single enterprise. *Id.* For example, a court may consider any undocumented transfers of funds, unclear allocation of profits and losses, and excessive fragmentation of a single business into separate corporate entities for purposes of recording profits and losses. *Id.; see also Rive v. Briggs of Cancun, Inc.,* 82 Fed. Appx. 359 (5th Cir.2003) (unpublished) (restating *Green's* eighteen factors).

The governing eighteen-factor standard was first articulated in *Green v. Champion Ins. Co.,* 577 So.2d 249. In *Green,* a special liquidator moved to enjoin the officers, directors, and other members of an insolvent insurance company from transferring assets to its parent corporation and other affiliated entities in its business group. *Id.* at 253–254. *Green* concerned, albeit in the insurance context, the paradigmatic veil-piercing situation-the defrauding of a creditor and the creditor's efforts to track down the assets of an insolvent debtor. *Green* 577 So.2d at 258. *Green* differed from traditional veil-piercing cases, however, in that the insurer transferred assets to its sister company, rather than to its shareholders. *Id.; See also, Abraham v. Lake Forest, Inc.,* 377 So.2d 465, 469 (La. Ct.App.1979) (veil piercing appropriate when commingling of funds between shareholder and corporation occurred).

To protect against the transfer of assets between affiliated corporations as a means of perpetuating fraud, the *Green* Court held that the insurer and its "related entities" were a SBE for liquidation purposes. *Green*, 577 So.2d at 258 (noting that the purpose of SBE theory was to "prevent fraud or to achieve equity") (citing *Glenn v. Wagner*, 67 N.C.App. 563, 313 S.E.2d 832, 839 (N.C.App.Ct.1984)). In so doing, the *Green* Court articulated and applied the eighteen factors listed above. *Id.* The court stated:

> In terms of structure, finance, and operations, this evidence demonstrates that the corporations were not operated as separate entities. They functioned as a single economic entity despite the internal compartmentalization of ownership and operation by means of separate incorporation.

*Id.* at 259.

Some courts have even extended the theory to unaffiliated corporations that lack common ownership, noting that "[i]f one corporation is wholly under the control of another, the fact that it is a separate entity does not relieve the latter from liability." *Grayson*, 778 So.2d at 14. While yet to apply the *Green* factors, both the Louisiana Supreme Court and United States Fifth Circuit Court of Appeals have cited *Green* in reference to Louisiana's SBE doctrine. *See Brown v. ANA Ins. Group*, 994 So.2d 1265, 1266 fn. 2 (La. 2008); *Hollowell v. Orleans Regional Hosp. LLC*, 217 F.3d 379, 387 (5th Cir. 2000).

*Green's* eighteen-factor test is difficult to apply, as it provides no guidance as to the weight to be given any of the eighteen factors or whether any, all or some of the factors must be present to find a SBE. Further, some of the factors are perfectly consistent with legitimate, efficient business operations, such as common control,

common employees, officers, and directors, shared offices, and some form of centralized accounting. *See* James Dunne, *Taking the Entergy out of Louisiana's Single Business Enterprise Theory*, 69 La. L.R. 691, 695 (2009). This suggests that the doctrine should be applied with care so as not to discourage business development. *Green* itself suggests that the purpose of the doctrine is the same as traditional veil piercing: to prevent fraud or achieve equity. *Compare Green*, 577 So.2d at 258; with *Riggins v. Dixie Shoring Co., Inc.*, 590 So.2d 1164, 1168 (La.1991) (noting that veil-piercing is most appropriate to prevent the use of the corporate form in the defrauding of creditors); and *Martin v. D.B. Martin Co.*, 10 Del.Ch. 211, 215, 88 A. 612 (Del. Ch.1913) (stating that corporate fiction will "never [be] resorted to when it would work an injury to any one [sic]"). Given that claimants invoke SBE doctrine to challenge an allegedly fraudulent enterprise, the Court finds that its application here will not extend the doctrine beyond manageable parameters.

It is well established law that a Court may impute the minimum contacts of one company to another based on various veil piercing theories. *See, Patin*, 294 F.3d at n. 18 (citing circuit cases and different veil piercing theories, including alter-ego theory and "reverse" veil piercing). Accordingly, the Court will analyze whether the jurisdictional contacts of the Crosby Companies may be imputed to BI or Capes under *Green's* eighteen factors. For the following reasons, the Court answers that question affirmatively for BI, and negatively for Capes.

## D. Baltimore Industries

BI argues that the Court does not have jurisdiction because sufficient minimum contacts do not exist between BI and Louisiana independent of BI's involvement with

the Crosby Companies. (R. Doc. 318, 341, 353, 354, 367). BI does not maintain offices or employees in Louisiana, and BI appears to have made only one sale in which its goods may have eventually been used in Louisiana. (R. Doc. 341, Harkness Aff.). While it is true that these contacts alone do not support the exercise of jurisdiction over BI, the Court's inquiry is not at an end. Claimants argue that BI along with the Crosby Companies formed a SBE. (R. Doc. 351). Before considering whether this is the case, it is necessary to determine the basis of the Court's jurisdiction over the Crosby Companies.

Each of the Crosby Companies is organized under the laws of Louisiana, with the exception of CE, which is organized under the laws of Maryland. (R. Doc. 351, Ex. C, Ex. G, Ex. H). The Crosby Companies have conducted and continue to conduct business in and around the New Orleans, Louisiana area, including but not limited to the allegedly fraudulent transactions that underlie this case. (R. Doc. 228). Such contacts with Louisiana are at least "minimal contacts" for jurisdictional purposes, and BI and Capes do not argue otherwise. *See Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 716 (5th Cir.1999).

The Court must next inquire whether the Crosby Companies and BI constitute a SBE under *Green.* BI argues that no SBE exists. (R. Doc. 348). In particular, BI argues that even though Crosby worked for BI in the past and Crosby and Karam considered "teaming up" in the future, no business relationship ever materialized. (R. Doc. 341). BI also points out that no common ownership exists and that

BI's business is otherwise unconnected to demolition work in Louisiana. *Id.*

■■■ Significant *Green* factors suggest, however, that BI and the Crosby Companies constitute a SBE. BI and the Crosby Companies use the same office space and share resources, including servers, fax machines, and e-mail accounts.[2] (R. Doc. 351, Ex. X); (R. Doc. 351, Ex. A, Crosby Dep. at 73); (R. Doc. 351, Ex. A, P. Karam Dep. at 12) ("Q: Why was it that [Crosby's] emails from Crosby Construction were leaving through the server at Baltimore Industries? A: Because the server in Baltimore Industries we are sharing."); (R. Doc. 351, Ex. L). Although, Karam is the president of BI, the bookkeeper and tax preparer for the Crosby Companies and BI, and is a member of the board of CE, his role is much greater. (R. Doc. 351, Ex. A, Karam Dep. at 94–95). Karam controls the financial operations of both BI and the Crosby Companies. (R. Doc. 351, Ex. A, Crosby Dep. at 33)(Crosby did not control daily operations); *Id.* at 206 (Karam wrote the checks); (R. Doc. 351, Ex. A, Crosby Dep. at 29–30, 33) (Karam handled the businesses); *Id.* at 224 (Karam controlled the finances of the Crosby Companies); *Id.* at 206 (Karam wrote the checks for the Crosby Companies). Further, the finances of BI and the Crosby Companies are intermingled. BI provides the Crosby Companies with money in the form of undocumented interest-free "handshake loans" for which BI is not repaid. (R. Doc. 351, Ex. A, Karam Dep. at 41) ("Q: When Baltimore Industries would wire money to Crosby, was there any loan agreements or paperwork that was drawn up? A: No. Q: It was just done on a handshake? A: It

---

2. When claimants communicated with Karam in regard to their investments with the Crosby Companies, Karam sent emails from his BI email account and set-up conference calls through BI's offices. (R. Doc. 351, Ex. X).

Moreover, emails sent from Karam's personal AOL account appear to the recipient as if sent from a Crosby Construction email address. (R. Doc. 351, Ex. A, Crosby Dep. at 272).

was.") ("A: If Crosby didn't have money or whatever, we had to wire some money, whatever was expedient. Q: But I still don't understand why Baltimore Industries would wire money to Crosby if there's no relationship between the two companies. A: We were trying to help them get along."). BI frequently withdraws money from the Crosby Company accounts for various expenses. (R. Doc. 351, Ex. S). BI also utilizes a joint bank account with one of the Crosby Companies. Specifically, the evidence demonstrates that BI and CCCL wrote two separate checks from the same Louisiana bank account. (R. Doc. 351, Ex. A, Crosby Dep. at 294–95) ("Q: How could Baltimore Industries and Crosby Construction be writing checks from the same account number when they're two separate companies? A: I don't know. They've got completely different check numbers.") ("Q: Why would Balitmore Industries have checks with that account number and Crosby Construction also have checks with that account number?" A: I have no idea."); (R. Doc. 351, Ex. N)(checks); (R. Doc. 351, Ex. K)(more checks). BI argues that the two companies did not use the same account because the two checks are not copies of "actual paper checks," but rather "check by phone data" that included BI's name and address by mistake. (R. Doc. 341). On their face, however, the two checks are from separate companies, BI and CCCL, and have identical routing and account numbers. Because the Court must resolve any issue of fact in claimants' favor (*see Thompson v. Chrysler Motors Corp.*, 755 F.2d at 1165), the Court finds that the checks evince BI's joint banking activity with the Crosby Companies. And lastly, BI does not observe many corporate formalities that might indicate its separateness, including the issuance of stock, annual shareholder meetings, formal board meetings, and corporate authorization for major transactions. (R. Doc. 351, Ex. A, Harkness Dep. at 15); (R. Doc. 351, Ex. A, Chaikin Dep. at 11).

Although other *Green* factors point to BI's independence, they do not prevent the Court from finding sufficient evidence of a SBE to establish a *prima facie* case for jurisdictional purposes. It is true that there is limited evidence of common ownership between the two companies that would confer common control. *Green*, 577 So.2d at 257. Geoff Harkness and Alicia Harkness, Karam's daughter and son-in-law, both own stock in BI and one of the Crosby Companies. But there is no evidence that the Harkness' stock ownership represents a majority ownership in BI or that the Harkness' ownership interest in the Crosby Companies is controlling. Karam himself allegedly does not have an ownership interest in BI. (R. Doc. 318, Karam Aff.). And, while Karam is BI's president and a CE board member, (R. Doc. 318, Karam Aff.), BI and the Crosby Companies do not share other officers or directors.

In this case, however, stock ownership is not a useful proxy for "working control." *Grayson*, 778 So.2d at 14. The documentary evidence suggests that Karam controls, without oversight, the financial operations of BI and the Crosby Companies. *See* discussion *supra;* (R. Doc. 351, Ex. A, Karam Dep.). The lack of knowledge by Crosby and BI's other officers and directors about company operations is testament to this fact. (R. Doc. 351, Ex. A, Harkness Dep. at 16 and 19); (R. Doc. 351, Ex. A, Chaikin Dep. at 11); (R. Doc. 351, Ex. A, Crosby Dep. at 224). Further, Karam withdraws money from BI and the Crosby Companies at will. (R. Doc. 351, Ex. A, Crosby Dep.) ("Q: Why would he be getting cash from your account-from the Crosby Construction account? A: Maybe I owe him. I don't know."); (R.

Doc. 228, Ex. G)(Karam check written to "Cash" from BI checking account). Thus while Karam may not have common stock, his control of the financial operations of both BI and the Crosby Companies is nonetheless evident. *Grayson*, 778 So.2d at 14 (looking at "control" as a proxy for ownership). BI also argues that it and the Crosby Companies are in separate lines of business. If true, BI has no good explanation for why the two companies have their hands in each other's pockets.

In addition, the nature of the allegations in this case further support application of the *Green* doctrine. BI's connection to the alleged fraudulent scheme is two-fold. First, claimants argue that BI participated directly in the fraud through its president, Karam, who exerted financial control over both BI and the Crosby Companies. Karam allegedly moved funds freely between BI and the Crosby Companies. (R. Doc. 228). Claimants reason that this was done in part for Karam's own gain and in part to insulate assets from the operational expenses the Crosby Companies incurred. (R. Doc. 351, Ex. X). And second, BI allegedly benefitted from the fraudulent scheme. (R. Doc. 228). Karam transferred more than $20,000 of the money Bona Fide invested in the Crosby Companies to BI, even though Bona Fide agreed with Crosby that its investment was to be used for specific purposes, such as the establishment of offices and hiring of credentialed staff. (R. Doc. 351, Ex. X).

In sum, many of the *Green* factors are present in this case and on the whole, the evidence demonstrates that BI and the Crosby Companies are not operated as distinct entities despite their separate incorporation. The underlying allegations of fraud, and BI's alleged involvement therein, further persuades the Court that fusing BI and the Crosby Companies is an equitable result. Claimants must only make a

prima facie showing of jurisdiction, *see Wilson*, 20 F.3d at 648, and the Court finds that they have done so.

### E. Capes Investment, LLC

Claimants make three arguments as to why Capes constitutes a SBE with the Crosby Companies. First, claimants argue that Capes's ownership interest in CE is sufficient in itself. (R. Doc. 351). Second, claimants argue that Karam controlled the financial operations of Capes and the Crosby Companies, and therefore the two are operated as one. (R. Doc. 384). And lastly, claimants argue that Karam, Crosby, and the Crosby Companies used Capes to extract assets from the Crosby Companies and thereby perpetuate the alleged fraud. *Id.*

First, the evidence demonstrates that Capes invested in and owns a 46 percent interest in CE. (R. Doc. 351, Ex. A, Karam Dep.). CE, in turn, maintains an interest in CC. (R. Doc. 351, Ex. A, Crosby Dep.). Capes's interest in the Crosby Companies is notably a minority one. Common ownership, however, is but one of *Green's* eighteen factors and is not dispositive. *Grayson*, 778 So.2d at 14. This is true even when the common ownership amounts to complete ownership, such as when two affiliated companies are wholly owned subsidiaries of a single parent corporation. *See Town of Haynesville, Inc. v. Entergy Corp.*, 956 So.2d 192 (La. Ct.App.2007) (holding that wholly owned subsidiaries were not a single business enterprise); *see also Dickson*, 179 F.3d at 339 (noting the insufficiency of even complete ownership as the sole premise upon which to pierce the corporate veil between parent and subsidiary companies). Capes does not own a controlling share of CE, and claimants do not argue that Capes controls CE or that CE's interest in CC is a controlling one. (R. Doc. 351 and 384).

Capes's ownership interest in CE does not therefore by itself support the conclusion that Capes and the Crosby Companies constitute a SBE.

Second, claimants argue that Karam's common control of the financial operations of Capes and the Crosby Companies suggests that the companies are operated as a SBE. (R. Doc. 351 and 384). Karam, however, does not maintain an ownership interest in Capes. (R. Doc. 351, Ex. A, Karam Dep.). Nor is Karam an officer or director of Capes. *Id.* The evidence suggests, in fact, that Capes does not appear to be an operating company at all. *Id.* Rather, Capes serves as a vehicle through which individuals invested in the Crosby Companies. (R. Doc. 351, Ex. A). Excluding its investment in CE, there is no record that Capes, through Karam's control or otherwise, shared bank accounts, commingled funds, or conducted any financial transactions with the Crosby Companies. (R. Doc. 351). There is no evidence of shared employees or intermingling of finances between the two. (R. Doc. 351). Nor is there evidence that Karam commingled the finances of Capes with his other businesses, such as BI. While Karam may have had a role in soliciting investments in the Crosby Companies through Capes, *see* R. Doc. 328, Pollekoff Dep., this evidence does not make a *prima facie* case that Capes operates as a SBE with the Crosby Companies.

Third, claimants argue that Capes's role in the alleged fraud suggests that Capes constitutes a SBE with the Crosby Companies. (R. Doc. 351). Specifically, claimants contend that Crosby or Karam used Capes to withdraw money from the Crosby Companies for personal gain. (R. Doc. 228, 367). The evidence submitted suggests the opposite. Notably, the deposition testimony suggests that Capes acted only as an investor in the Crosby Compa-

nies. (R. Doc. 351, Ex. A). Karam solicited individual investors in the Crosby Companies through Capes, including his own family members. *See* (R. Doc. 351, Ex. A., A. Harkness Dep. at 38–39). He offered each a guaranteed $30,000 for every $50,000 invested, not to mention $2,000 a month if the promised return did not come into existence within an allotted period of time. *See* (R. Doc. 351, Ex. A., A. Harkness Dep. at 38–39). There is no evidence, however, that Capes received money from the Crosby Companies, or that Karam withdrew money from Capes for personal use or for use by the Crosby Companies. *Id.* Further, there is no evidence that Capes's investors have received any return on their investment. *Id.* Claimants have not demonstrated that Capes played a role in the alleged fraud perpetuated on claimants.

Capes shares office space with BI and the Crosby Companies. This, and Capes's investment in CE are *Green* factors, but without more, they are not probative of a SBE. (R. Doc. 351). Even drawing all reasonable inferences in claimants' favor, claimants have not made a *prima facie* case for jurisdiction.

## III. FAILURE TO STATE A CLAIM

### A. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. A court must accept all well-pleaded facts as true and

must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 232–33 (5th Cir. 2009); *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal,* 129 S.Ct. at 1949–50.

A legally sufficient complaint must establish more than a "sheer possibility" that plaintiff's claim is true. *Id.* It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand,* 565 F.3d at 255–57. If there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock,* 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Carbe v. Lappin,* 492 F.3d 325, 328 & n. 9 (5th Cir.2007), the claim must be dismissed. In a motion to dismiss for a failure to state a claim under Rule 12(b)(6), the Court may not consider materials outside the pleadings. *See* Fed. R. Civ. Pro. 12(b); *O'Quinn v. Manuel,* 773 F.2d 605, 608 (5th Cir.1985). In this respect, the Court's Rule 12(b)(6) analysis differs from the jurisdictional inquiry above, which considered depositions and affidavits outside the pleadings.

**B. Discussion**

Claimants allege that BI, by and through its involvement with Crosby, Karam, and the Crosby Companies, participated in a scheme to fraudulently induce claimants to invest money in the Crosby Companies. (R. Doc. 351). Claimants argument proceeds in three parts: (1) the Crosby Companies are liable under the legal theories asserted for their conduct and participation in the alleged fraud, (2) BI constitutes a SBE with the Crosby Companies, and therefore (3) BI shares any liability attributed to the Crosby Companies. (R. Doc. 228). In opposition, BI argues simply that claimants have not alleged sufficient facts to state a plausible claim against it, based on its own specific conduct, and independent of any actions of the Crosby Companies. (R. Doc. 318). BI does not argue that claimants have not pleaded sufficient facts to assert a plausible claim against the Crosby Companies. Nor does BI argue that there are insufficient factual allegations to allege a nonspeculative right to relief against it, if the Court finds that BI constitutes a SBE with the Crosby Companies-as it did above for jurisdictional purposes. (R. Doc. 351). In short, the lynchpin of BI's motion to dismiss is that it is not part of a SBE with the Crosby Companies. *Id.*

 SBE theory is not restricted to jurisdictional analysis. It is also a "vehicle for holding a group of affiliated entities responsible for the obligations of one of the entities." *Lee v. Clinical Research Center of Florida, L.C.,* 889 So.2d 317, 323 (La.App.Ct.2004). "When a group of corporations integrate their resources to achieve a common business purpose and do not operate as separate entities, each affiliated corporation may be held liable for debts incurred in pursuit of the general business purpose." *Brown,* 644 So.2d at 727. Louisiana appellate courts have applied the SBE theory to subject corporate capital assets to liability in various contexts, including those at issue here, such as intentional misrepresentation and breach of contract. *See, e.g., Brown,* 644 So.2d at

 **451**

727 (insurance fraud); *Lee,* 889 So.2d at 323 (employment contract); *Town of Haynesville, Inc. v. Entergy Corp.,* 840 So.2d 597 (La.App.Ct.2003) (contract claim without concurrently alleged fraud); *Dishon v. Ponthie,* 918 So.2d 1132, 1136 (La. Ct.App.2005) (subcontracting). Put simply, when part of a SBE, a corporation ceases to have legal status of its own. *Brown,* 644 So.2d at 727. The cognizable legal entity is the SBE. *Id.* Establishment of a SBE is a question of fact to be decided at trial. *State ex rel. Guste v. Green,* 657 So.2d 610, 615 (La.Ct.App.1995).

 The facts alleged allow the Court to draw the reasonable inference that, if true, the defendant would be liable for the misconduct alleged with the Crosby Companies, *et al.,* under a SBE theory of liability. *Iqbal,* 129 S.Ct. at 1949. And BI does not dispute that plaintiffs have alleged viable claims against the Crosby Companies. (R. Doc. 318). BI's motions to dismiss are therefore without merit and hereby DENIED.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Capes's motions to dismiss for lack of personal jurisdiction. In addition, the Court DENIES BI's motions to dismiss for lack of personal jurisdiction and DENIES BI's motions to dismiss for failure to state a claim. (R. Doc. 318, 353, 354, and 367).